**UNITED STATES of America, Appellee,**

v.

**J. Wilton HUNT, Sr., Appellant.**

**No. 83–5088.**

United States Court of Appeals,
Fourth Circuit.

Argued May 11, 1984.

Decided Nov. 28, 1984.

Sprouse J., dissented and filed opinion.

W. Gary Kohlman, Washington, D.C. (Kenneth M. Robinson, Washington, D.C., on brief), for appellant.

Francis J. Martin, Dept. of Justice, Washington, D.C. (Samuel T. Currin, U.S. Atty., Raleigh, N.C., on brief), for appellee.

Before RUSSELL and SPROUSE, Circuit Judges, and JAMES H. MICHAEL, Jr., United States District Judge for the Western District of Virginia, sitting by designation.

DONALD RUSSELL, Circuit Judge:

Appellant J. Wilton Hunt, Sr., a North Carolina state district judge, was convicted following a jury trial of the following offenses: 1) conspiracy to conduct the affairs of an enterprise, his judgeship, through a pattern of racketeering activity, accepting bribes in violation of North Carolina law, 18 U.S.C. §§ 1962(d) and 1963 (the RICO statute); and 2) facilitating the making of an interstate telephone call with the intent to carry on an unlawful activity, gambling in violation of North Carolina law, 18

U.S.C. § 1952(a). His principal defenses below were entrapment and alleged improper conduct by government agents in violation of due process. The defendant did not testify at trial. Hunt now appeals from his convictions, and we affirm.

### I.

This prosecution arose from an undercover investigation of corruption in Columbus County, North Carolina begun in 1980 by the Federal Bureau of Investigation, and known by the acronym "Colcor." The Colcor investigation lasted until mid-1982, culminating in the indictments of several public officials, including Judge Hunt. The defendant was first elected to the District Court for the 13th Judicial District of North Carolina, an area comprised of three counties including Columbus, in 1974, and as a judge presided over misdemeanor cases and traffic offenses. He held judicial office throughout the relevant period of the Colcor investigation.

The FBI investigation was first directed toward Hunt in August 1980. At that time Joseph Moody, who was scheduled to appear in Hunt's court on assault charges, informed the FBI that Danny Edwards, a local criminal, had claimed that he could bribe the judge. The FBI gave Moody $300 to deliver to Edwards, who was supposed to use the money for an attempted payoff. Hunt never appeared for the purportedly arranged meeting with Edwards, which was under FBI surveillance, and Edwards evidently pocketed the bribe money.

Nevertheless, the FBI continued its investigation of Hunt, and subsequently Moody informed the FBI that another individual, James Carroll, had also claimed that he could "deliver" the judge. FBI agent William L. Redden, together with Moody, met Carroll at the Roxanne Club, a bar in Whiteville, North Carolina which Carroll operated, on October 23, 1980. Redden, acting undercover, presented himself to the unwitting Carroll as Bill Leonard, the representative of a criminal syndicate or organization interested in making financial investments in the area. Redden suggested that he was interested in acquiring the Roxanne Club for as much as $400,000, as a front for various illegal activities such as drugs and prostitution, and needed protection from local authorities. Carroll, who testified at trial as a government witness, told Redden that he was acquainted with Hunt, and that the judge would be "available for protection payments." He claimed to be a close personal friend of Hunt, and mentioned that the judge liked to play poker. Redden told Carroll that the assurances of protection would have to come from Hunt personally, and asked Carroll to arrange a meeting.

After further pressure from Redden, who admitted that he was "leaning on Carroll very hard" during this part of the investigation, Carroll finally managed to arrange a meeting between Redden and Hunt in a motel room in Whiteville on November 20, 1980. Prior to this meeting, Carroll had told Redden that the judge "didn't seem to care about the money," and no offer of money had been made. Redden and several other FBI agents were present at the November 20 meeting in undercover roles, and the conversation was secretly recorded. Redden did not make his supposed organized crime connection explicit to the judge, but simply told Hunt that he was interested in buying the Roxanne Club for a steak house, suggesting that illegal poker games would be run on the premises. There was evidence that Hunt had previously participated in similar games, as recounted by witnesses at trial. Redden asked the judge for "advice" on possible problems with law enforcement in the area, and Hunt, far from opposing the idea of the illegal games, told Redden that operators of the games would not be likely to receive jail time for a first offense. Redden made no explicit offer of money at this meeting, explaining afterward that the purpose of the meeting was "just to feel each other out to see exactly who the judge was and what his feelings were." He acknowledged the possibility that the judge might not have been corrupt.

Soon after the November 20 meeting, Carroll made it clear to Hunt that Redden was interested in paying $1500 a month for the judge's protection. Hunt replied, "That sounds good." Carroll reported the agreement to Redden, and a second meeting took place on December 3, 1980. Redden and Carroll found the judge in a Whiteville "beer joint," and Hunt joined the two outside in a car. Their conversation was recorded. Redden again explained to the judge their need for protection of the planned gambling, and the judge expressed his understanding. Redden then gave Carroll an envelope containing $1000 in cash, and Hunt accepted the money from Carroll. Before leaving, Hunt said that he had never taken money before and found it difficult, but then proposed that the money be considered a "campaign contribution." On December 22, Redden gave Carroll the remaining $500 for delivery to the judge, who had requested the money, and a week later Hunt confirmed that he had received the payment.

Hunt accepted a second $1500 protection payment from Redden on January 26, 1981. Shortly thereafter, Redden retired from the FBI for health reasons and was relieved of his Colcor responsibilities, being replaced by another FBI agent, Robert Drdak, who was introduced to Carroll as another member of Redden's organization, Thomas "Doc" Ryan. Drdak first met Hunt on February 24, 1981, giving the judge his third protection payment of $1000. He now made it clear to Hunt that the organization of which he was a part was involved in drug dealing as well as gambling, and wanted the judge to set low bonds for any of his associates who were arrested, making it easier for them to flee. Hunt agreed to do so. He admitted to Drdak that someone else had offered him half a million dollars to protect a local narcotics smuggling operation, and that he "didn't know what to do" about that offer, as "it was a lot of money." Drdak also requested the judge's assistance in "taking care of some traffic problems" for a Mr. Moody, an important member of their operation, who was facing suspension of his license, and the judge consented to "handle" it.

On March 30, 1981, Drdak again met with Hunt, giving the judge his monthly payoff. Hunt reported on his efforts to take care of Moody's traffic problems, assuring Drdak that Moody's ticket would not be treated as a conviction. Drdak told Hunt that he planned to open a gold and silver business in Whiteville to serve as a front for drug smuggling. Hunt agreed to help Drdak obtain a required license for the business, telephoning a county commissioner and a county attorney about the matter. The next day Drdak received his license, and subsequently opened the business.

Drdak's next recorded meeting with Hunt was on June 22, 1981, when a $2000 protection payment was made, and Moody's traffic problems were discussed, as well as the drug smuggling plans. Hunt was unwilling to participate directly in the smuggling, but agreed to talk to a local sheriff and "put his mind at ease" about Drdak's operation. The judge admitted having previously attempted to buy some smuggled diamonds.

At a September 22, 1981 meeting between Hunt and Drdak, which was both recorded and videotaped, the judge accepted his next $1500 payment. Hunt agreed to take care of a speeding ticket issued to another of Drdak's undercover associates, Brad Hoferkamp, and this charge was in fact subsequently reduced. Drdak had previously asked Hunt to put him in touch with local bookmakers, and at the September 22 meeting, Hunt gave Drdak a South Carolina telephone number for a bookmaker, Frank McDuffy. Drdak later placed several bets with McDuffy, forming the basis for Count II of the indictment.

Hunt and Drdak held their next meeting on October 21. No payment was made at this time. The judge expressed his concern that his name had been linked in local rumors to a large drug operation uncovered by the police in Brunswick County, North Carolina, and that Carroll had been using his name indiscriminately. Hunt maintained that he could be of no further use to

Drdak if he were personally under suspicion.

On November 9, 1981, Drdak had his final contact with Hunt in a telephone call concerning Hoferkamp's ticket, which was reduced the next day. Thereafter, the FBI agents discontinued their relationship with the defendant, believing that they now had enough evidence, and that the public rumors beginning to arise concerning the judge afforded a plausible excuse for withdrawing.

## II.

The most substantial issue raised by the appellant concerns the admission into evidence at trial of certain allegations about Judge Hunt made known to the FBI before the start of its undercover investigation. Hunt contends that this testimony amounted to inadmissible hearsay, and that its use violated his right of confrontation under the Sixth Amendment.

Specifically, FBI agent Terry D. Peters testified on direct examination by the government that he had informed both Redden and Drdak, before each went undercover, of three sources of allegations concerning Hunt. First, in late summer of 1980, the FBI received a report of an interview conducted by law enforcement authorities in Virginia, in which a woman claimed that a cousin of Judge Hunt had told her that Hunt had "taken care of" some firearms charges against him. Second, members of the Columbus County sheriff's office and the Whiteville police department asserted that Hunt was associating socially with local criminals, had a reputation of personally taking guns seized as evidence, and had attempted, according to an unidentified source, to purchase stolen weapons. Third, Danny Edwards told the FBI that Hunt was involved in the sale and possession of drugs in Columbus County, and had bought a M–16 automatic weapon from Edwards. Peters later told Drdak only of

similar allegations of Hunt's criminal associations received from county and city police during the investigation. On direct examination by the government, Drdak confirmed having learned from Peters about Hunt's reputed criminal associations, alleged involvement in narcotics, and supposed acquisition of guns held in police custody. The original informants for all these allegations never testified, nor did the government make any showing of their unavailability.

█ The government concedes in this case that hearsay evidence may not ordinarily be used as proof of predisposition where an entrapment defense is made, unless otherwise admissible under a recognized hearsay exception. It seems that every circuit to have considered the use of hearsay in entrapment cases has taken a position similar to that conceded by the government. *See United States v. Webster,* 649 F.2d 346, 347 and n. 1 (5th Cir. 1981) (en banc—with a strong dissent from nine members of the Court); *United States v. McClain,* 531 F.2d 431, 437 (9th Cir.), *cert. denied,* 429 U.S. 835, 97 S.Ct. 102, 50 L.Ed.2d 101 (1976); *United States v. Ambrose,* 483 F.2d 742, 750 (6th Cir.1973); *United States v. Johnston,* 426 F.2d 112, 114 (7th Cir.1970); *United States v. Catanzaro,* 407 F.2d 998, 1001 (3d Cir.1969); *Whiting v. United States,* 296 F.2d 512, 519 (1st Cir.1961).[1] It has long been recognized, however, that an "appropriate and searching inquiry" into a defendant's predisposition may be undertaken where entrapment is claimed, *Sorrells v. United States,* 287 U.S. 435, 451, 53 S.Ct. 210, 216, 77 L.Ed. 413 (1932). The introduction of "gross hearsay," *Webster,* 649 F.2d at 350, may well be searching, but it has been said not to be appropriate, especially where such hearsay lacks both a showing of the original declarant's unavailability and the "particularized guarantees of trustworthiness" mandated by *Ohio v. Roberts,* 448

---

**1.** *Cf. United States v. Cunningham,* 529 F.2d 884, 887 (6th Cir.1976) (cross-examination of defendant claiming entrapment held improper since based on hearsay reports); *Hansford v. United States,* 303 F.2d 219, 226 (D.C.Cir.1962) (uncorroborated evidence of prior offense inadmissible to rebut claimed entrapment.)

U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980) in satisfaction of the defendant's rights under the Confrontation Clause. Accordingly, had the testimony of agents Peters and Drdak been elicited as proof of the matters asserted, in order to show the defendant's predisposition to commit the offenses charged, there could be legitimate doubt as to its admissibility.

The actual context of Peters' and Drdak's testimony, however, creates greater complexity. Prior to trial, the defendant had moved to dismiss the indictment on the ground of "outrageous government investigative conduct" in violation of his due process rights, part of this argument being that the government had "no evidence of the defendant's illegal conduct other than that initiated by its own operatives." Such a contention is also pressed on this appeal as grounds for reversal. In cross-examination of agent Redden, who testified prior to Peters and Drdak, the defense sought to establish that the FBI had no evidence that Hunt might be corrupt before commencing the investigation, and Redden could not identify any such evidence.[2] Counsel for the government thereupon informed the court that Redden was apparently trying to avoid discussing the information he had received from Peters, and counsel for the defendant expressed his willingness to allow Redden to answer as to what he knew.[3] Thus, the testimony of Peters and Drdak now claimed to be objectionable was only introduced after persistent efforts of the defense to call into question the government's basis for investigating Hunt at all. When the defense objected to Drdak's testimony, the district court admitted it on the ground that it went to "probable cause, state of mind."[4] Likewise, the court overruled a defense objection to Peters' testimony regarding what he learned from Edwards because "it's a question of what

2. Cross-examination of Redden proceeded in relevant part:

Q. "What I'm driving at, isn't it true that as of August 27, 1980, the F.B.I. had no file of corruption on Judge Hunt at all?"
A. "To my knowledge, no."
Q. "That indicates that there's no file indicating that he is doing similar activities as of August 27, to your knowledge, isn't that right?"
A. "To my knowledge, right."
Q. "I want you to name for this jury, sir, one piece of paper, one tape, one informant—and you can give the name to the judge so I don't reveal its confidentiality—one source that says when you came to Judge Hunt there was evidence of him being corrupt in the past. I want you to name it right now."
A. "Not that Judge Hunt by name."

3. At the bench conference discussing the cross-examination of Redden recounted *supra*, n. 2, the following colloquy ensued:

Mr. McCullough: "What I think the agent is trying to avoid saying is when he checked with agent Peters, who is the agent that covered the county, there were A.T.F. files of reports that Judge Hunt had shielded people from stolen property, like in past cases that were in the file at the time he went back to that were from years past, and I have those documents."
Mr. Robinson: I'm giving him every chance to say what he saw."
Mr. McCullough: "Do you want him to put that on the record? I think he's trying to avoid saying that."

Mr. Robinson: "Fine. My point is that he wouldn't answer under oath before and so far today that he never had any knowledge of him taking any kind of payoff prior to this case."
Mr. McCullough: "I think the question has gone a little far afield than just payoffs."
The Court: "The next question is, if he puts this in now, are you prepared to run with that?"
Mr. Robinson: "If he goes with it. Frankly, being candid about it, at some point they may try to argue any criminal activity is predisposition. I'm not saying that I agree with that, but I'm prepared to take any kind of punches. I know there's allegations, but what's important is what did this agent know when they indicated to him specifically that there was some indication of predisposition. It doesn't matter if they go out and find something after the fact."
The Court: "Well, he's telling you what other people have told him; that's basically what he has said."

4. At the time of the district court's ruling on Drdak's testimony, counsel engaged in a discussion on the meaning of predisposition, which the defendant relies upon in contending that Drdak's testimony was admitted to show his predisposition to commit the acts charged. Suffice it to say that the arguments of counsel cannot be equated to the rulings of the court, the meaning of which are made abundantly clear by the subsequent ruling on the objection to Peters.

information they had," and "[w]hether it's true or not is another matter." [5]

 On appeal the defendant disingenuously contends that because good faith on the part of the government is not relevant to an entrapment defense, *see United States v. DeVore*, 423 F.2d 1069, 1071 (4th Cir.1970), *cert. denied* 402 U.S. 950, 91 S.Ct. 1604, 29 L.Ed.2d 119 (1971), which focuses rather on a defendant's predisposition, *see United States v. Russell*, 411 U.S. 423, 433, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973), the district court could not properly have admitted the agents' testimony on the ground that it went to what they knew in commencing the investigation. It is evident that the defense simultaneously sought to develop both its entrapment and due process claims, which are analytically distinct though relying to some extent on the same facts. Though only the entrapment claim was for the jury to resolve, the government was nevertheless entitled to develop its rebuttal to the due process theory as well, once the defense called the government's conduct into question. Having "opened the door" the defendant may not be heard to complain of testimony which proved adverse to his position that the government had no reason to investigate him.[6] As the rulings of the district court demonstrate, this evidence was not introduced to "prove the truth of the matter asserted," Fed.R.Evid. 801(c), but merely to refute criticism of the government's decision to launch its undercover investigation of Hunt, and therefore did not fall within the definition of hearsay.[7] In *Webster*, the Fifth Circuit recognized that the government could, in special circumstances, prove what its agents had been told about a defendant "as evidence of good faith, reasonableness or proper motive," in order to rebut contrary assertions by a defendant. 649 F.2d at 347–48, 351. This case presents the paradigm situation for application of such a rule. Had the question of the government's basis for the investigation never been raised by the defense, there would, of course, have been no ground for admission of Peters' and Drdak's testimony. We hold, however, that where a defendant elects to challenge the government's conduct of an investigation, the government may introduce rebuttal evidence, even though it would amount to hearsay if it were intended to prove the truth of matters asserted, for the limited purpose of demonstrating that the investigation was reasonable and free of improper motive.[8] Thus, it follows that the district court did not err in admitting the challenged testimony.

### III.

The defendant next contends that the evidence of his predisposition to engage in the offenses charged was insufficient to sustain a conviction as a matter of law. This claim, we find, cannot be sustained.

 Once a defendant has presented some evidence of inducement by government agents, *see United States v. Perl*, 584

---

5. It does not appear that the defense ever made a specific objection to introduction of the allegations about Hunt that Peters received from law enforcement officials in Columbus County.

6. *See United States v. Rangel*, 534 F.2d 147, 149 (9th Cir.), *cert. denied*, 429 U.S. 854, 97 S.Ct. 147, 50 L.Ed.2d 129 (1976) (rejecting claim that hearsay improperly admitted to prove predisposition where matter opened up by defense counsel).

7. *See United States v. Scott*, 678 F.2d 606, 612 (5th Cir.), *cert. denied*, 459 U.S. 972, 103 S.Ct. 304, 74 L.Ed.2d 285 (1982) (support existed for admission of alleged radio communications of conspirators because not introduced to prove

truth of matter asserted but to show why Coast Guard undertook investigation).

8. Since hearsay evidence, as we have indicated, may not be used to prove predisposition, the defendant would have been entitled to a limiting instruction, providing that the testimony of the agents was not to be considered for the truth of the matters asserted, and did not bear in any way on the defendant's entrapment claim. Alternatively, once made aware of the nature of the evidence that the government might introduce, the defense might have agreed to a stipulation with the government, thereby keeping any potentially prejudicial information from the jury. The record does not show that either course was considered by the defense.

F.2d 1316, 1321 (4th Cir.1978), *cert. denied,* 439 U.S. 1130, 99 S.Ct. 1050, 59 L.Ed.2d 92 (1979); *DeVore,* 423 F.2d 1069, 1071, the burden rests on the government to overcome an entrapment defense. The Supreme Court has offered various formulations of the nature of entrapment, stating that such a claim may only prevail where "the Government's deception actually implants the criminal design in the mind of the defendant," *Russell,* 411 U.S. at 436, 93 S.Ct. at 1645, *see also DeVore,* 423 F.2d at 1071, or that the criminal conduct must have been "'the product of the *creative* activity' of law enforcement officials," *Sherman v. United States,* 356 U.S. 369, 373, 78 S.Ct. 819, 821, 2 L.Ed.2d 848 (1958), quoting *Sorrells,* 287 U.S. 435, 451, 53 S.Ct. 210, 216, 77 L.Ed. 413 (emphasis supplied in *Sherman* ). In any event, it is clear since *Russell* that the essential element of the entrapment defense is the defendant's lack of predisposition to commit the crime charged. 411 U.S. at 433, 93 S.Ct. at 1643.

■ Predisposition is necessarily a nebulous concept,[9] and has generally been held to be a question for the jury, unless the evidence is plainly insufficient as a matter of law. *See, e.g., United States v. Jannotti,* 673 F.2d 578, 597 (3d Cir.), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982), and cases cited therein. On review we may only overturn the jury's determination if, viewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found predisposition to exist beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S.

307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Jannotti,* 673 F.2d at 598.

■ Predisposition, as recognized in the recent series of ABSCAM decisions, "refers to the state of mind of a defendant before government agents make any suggestion that he shall commit a crime," but does not require "specific prior contemplation of criminal conduct." *United States v. Williams,* 705 F.2d 603, 618 (2nd Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 524, 525, 78 L.Ed.2d 708 (1983). "It is sufficient if the defendant is of a frame of mind such that once his attention is called to the criminal opportunity, his decision to commit the crime is the product of his own preference and not the product of government persuasion." *Id.* Predisposition may be found from a defendant's ready response to the inducement offered. *United States v. Myers,* 692 F.2d 823, 836 (2d Cir.1982), *cert. denied,* 461 U.S. 961, 103 S.Ct. 2437, 2438, 77 L.Ed.2d 1322 (1983). As the Third Circuit observed in *Jannotti,* it is extremely difficult to show predisposition of a public official to accept bribes through direct evidence of prior involvement in similar conduct, and in such circumstances it is necessary to consider the situation surrounding the illegal conduct; indeed, "the very acceptance of a bribe by a public official may be evidence of a predisposition to do so," 673 F.2d at 604, at least where, as here, the jury is provided with such strong evidence of the transactions as recordings and videotapes, from which the defendant's willingness or reluctance may be assessed. Where, as in this case, the defendant is involved in a continu-

---

9. The standard jury instruction on entrapment, as given here, asks whether the defendant was "ready and willing" to commit crimes such as charged whenever the opportunity was afforded. 1 Devitt & Blackmar, Federal Jury Practice and Instructions § 13.09 at 364 (3d ed. 1977). This is hardly more illuminating than the general notion of predisposition itself, given that one's willingness to commit a crime would necessarily depend on the level of inducement offered and the circumstances created by government agents. *See* L. Seidman, *The Supreme Court, Entrapment, and Our Criminal Justice Dilemma,* 1981 Supreme Court Review 111, 118–19. "Persistent offers, exorbitant amounts

of money, and appeals to emotion or civic duty may seduce a person of ordinary firmness into a compromising position." B. Gershman, *Abscam, the Judiciary and the Ethics of Entrapment,* 91 Yale L.J. 1565, 1584 (1982). It is simply naive to suppose that public officials, or other defendants, can be neatly divided between the pure of heart and those with a "criminal" outlook. As it would appear, however, to be impossible to formulate a more coherent definition of predisposition consistent with the Supreme Court's decisions, the whole matter is best left to the discretion of juries, constrained only perhaps in the use of unreliable character evidence, as we have done in Part II, *supra.*

ing relationship with the government agents, his state of mind may even be assessed by later events in the relationship bearing on his attitude prior to the initial opportunity for illegal conduct. We emphasize that the jury is not required to infer predisposition from any such evidence, but is entitled to determine what weight if any is to be accorded to relevant evidence before it.

 It may readily be conceded that the evidence of predisposition is not overwhelming here, while finding nonetheless that it is adequate to sustain the defendant's convictions. Turning to the facts before us, it appears that Hunt was willing to meet Redden and his associates in a motel room on November 20, 1980 at Carroll's behest. Hunt learned at that meeting that the Roxanne Club would be used for illegal gambling, and yet was willing to remain at the meeting and even provide advice on the attitudes of local authorities to the proposed criminal activity. The jury, presented with conflicting explanations for the absence of any payoff on November 20, could reasonably assume that the parties were "feel[ing] each other out" as explained by Redden, rather than that the judge never contemplated any corruption. More significantly, once Carroll made Redden's payoff proposal explicit soon after the first meeting, no significant pressure or cajoling was required to secure the judge's assent. Thus, prior to the crucial December 3 meeting when the criminal opportunity was first presented, substantial circumstantial evidence of the judge's predisposition had already accumulated. The preliminary discussion between Redden and Hunt on December 3 could have left no further doubt in the judge's mind as to the illegality of the proposed conduct, and there was nothing to prevent him from breaking off relations at that point, yet he chose to proceed along the path to corruption. In accepting the proffered money, the defendant himself advanced the facile excuse of a "campaign contribution." Furthermore, Hunt never demonstrated any desire to withdraw from the protection scheme until his name had been publicly linked to criminal activities several months later; more visible qualms could have been expected from a public servant of reasonable rectitude who had been led astray.[10] The excuse offered by the defense that Hunt feared to withdraw cannot withstand analysis, in light of Redden's caution in approaching the judge. Not until Drdak entered the investigation, after the judge had already accepted several payoffs, did the defendant learn that the individuals with whom he dealt were engaged in a more extensive range of criminal activity than illegal gambling. Whatever the unwitting middleman Carroll may have believed or feared about the agents is of little relevance, in the absence of any evidence that the government agents either threatened the judge themselves or told Carroll to do so.[11]

Our review of the recent series of ABSCAM decisions, *see United States v. Kelly*, 707 F.2d 1460 (D.C.Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 264, 78 L.Ed.2d 247 (1983); *Williams*, 705 F.2d 603; *Myers*, 692 F.2d 823; *Jannotti*, 673 F.2d 578, reveals certain significant parallels in the conduct of the .public officials involved, including preliminary contacts through presumably "safe" middlemen and initial caution as the parties felt one another out, before any outright opportunity for corruption arose,

10. Only one piece of evidence, which the jury was entitled to disbelieve, even suggested pangs of conscience. A close friend of the judge, Thurston Watts, claimed that immediately after the December 3 meeting, the judge admitted to him that he had accepted money, but would have to return it. There is no evidence whatsoever that the defendant ever actually tried to return any of the money, and in December 1980, after receiving his first payoff, he actually inquired after the remaining $500 due.

11. According to the judge's friend Thurston Watts, the defendant did not return the money accepted on December 3 because Carroll told him that he was dealing with "organized crime figures" who would not take the money back. Watts did not claim ever to hear Carroll make such a statement, but supposedly received his information secondhand from the defendant. Carroll denied ever making such a statement to the judge after the December 3 meeting.

all circumstances present here as well. In at least one respect, the defendant's behavior here is even less excusable than that of the ABSCAM defendants: those individuals typically held legislative posts, which necessarily lead to contacts with those seeking political favors. A judge, whether elected or appointed, must be more circumspect in his dealings with the public, in light of the standards of judicial ethics and the responsibilities of his office, which require him to be a neutral arbiter above partisan concerns. We hold that the evidence against the defendant was sufficient for the jury to find the requisite predisposition and to reject the entrapment defense.[12]

## IV.

■ The appellant also urges us to find that the government's conduct of the investigation was so outrageous as to violate due process, a claim distinct from the unsuccessful entrapment defense. While the Supreme Court has suggested that such a defense might be proper in certain circumstances, *see Hampton v. United States,* 425 U.S. 484, 493, 96 S.Ct. 1646, 1651, 48 L.Ed.2d 113 (Powell, J., concurring in judgment), 499, 96 S.Ct. at 1654 (Brennan, J., dissenting) (1976); *Russell,* 411 U.S. at 431–32, 93 S.Ct. at 1642–43; *but see Hampton,* 425 U.S. at 489–90, 96 S.Ct. at 1649–50 (opinion of Rehnquist, J.), it has yet to allow a due process attack on a government investigation to prevail, and only two circuits have set aside convictions on this basis. *United States v. Twigg,* 588 F.2d 373 (3d Cir.1978); *Greene v. United States,* 454 F.2d 783 (9th Cir.1971). Assuming that in some circumstances a due process defense might have merit notwithstanding the predisposition of the defendant to commit the offenses charged, it is apparent here that the conduct of the FBI agents was hardly so "outrageous," *Russell,* 411 U.S. at 432, 93 S.Ct. at 1643, as to preclude a conviction.

The defendant launches a two-pronged assault on the government's investigation.

He first faults the persistence of the government in pursuing him, and next alleges that the hints of violence occasionally dropped by FBI agents during the investigation constituted due process violations. As to the former claim, we can hardly criticize the government for reasonably pursuing available leads concerning judicial corruption, although some proved barren and others did not immediately bear fruit. The reports received by the FBI created a reasonable basis for the investigation of Hunt; we are not faced with an indiscriminate government fishing expedition. Nor are we presented with a situation where a defendant firmly refused a proposed payoff, and thereafter was incessantly hectored by government agents to reverse his decision; such a situation, indeed, might be equally well resolved on entrapment grounds as due process. Hunt's failure to jump to the bait on November 20, and his seeming lack of interest in money in his preliminary discussions with Carroll, could reasonably be construed as mere negotiating tactics, and do not render the government's subsequent conduct "outrageous." The latter prong of the defendant's due process claim is similarly flawed, for, as noted in part III, *supra,* there is no evidence whatever that the government agents ever threatened the judge themselves or pressured anyone else to do so. Hunt may well have believed that he was dealing with the criminal underworld, but this in itself did not render the investigation "outrageous." As the Ninth Circuit observed in rejecting a similar due process defense:

> "We have long since recognized that the government may employ undercover tactics to infiltrate criminal ranks and may rely on paid informants in order to locate and arrest criminals.... This being so, the informants and undercover agents must be permitted, within reason, to assume identities that will be convincing to the criminal elements they have to deal with."

---

**12.** It is equally clear, and we so hold, that the evidence of Hunt's predisposition to facilitate an interstate bet was sufficient to sustain the § 1952(a) conviction.

*United States v. McQuin,* 612 F.2d 1193, 1195–96 (9th Cir.), *cert. denied,* 445 U.S. 954, 955, 100 S.Ct. 1607, 1608, 63 L.Ed.2d 791 (1980). The FBI agents in this case had to make their undercover roles convincing to their unwitting middleman, Carroll, a disreputable figure himself, and thus chose to present themselves as tough characters, dangerous if crossed.[13] In their dealings with the judge both Redden and Drdak behaved with much more restraint, never threatening any violence in his presence. We can find nothing sufficiently "outrageous" in the agents' performance of their criminal roles to warrant reversal on due process grounds.[14]

## V.

 Finally, the defendant contends that he cannot be prosecuted under the Racketeer Influenced and Corrupt Organizations (RICO) statute, 18 U.S.C. § 1961 *et seq.,* because he is not a member of "organized crime," and was the victim of a crime manufactured by the FBI. Although the Supreme Court has recognized that "the primary purpose of RICO is to cope with the [organized crime] infiltration of legitimate businesses," *United States v. Turkette,* 452 U.S. 576, 591, 101 S.Ct. 2524, 2533, 69 L.Ed.2d 246 (1981), it has declined to limit the applicability of RICO to its core purpose alone, and lower courts have expressly held that the RICO statute does not require proof that the defendant or his enterprise is connected to organized crime. *See, e.g. United States v. Aleman,* 609 F.2d 298, 303 (7th Cir.1979), *cert. denied,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980). We have previously upheld convictions of public office holders under RICO where there was no evidence of any "organized crime" connection, *see, e.g. United States v. Long,* 651 F.2d 239 (4th Cir.), *cert. denied,* 454 U.S. 896, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981), and we will not graft an ambiguous "organized crime" precondition onto the RICO statute now. That a crime may have been "manufactured" by the government is properly dealt with under the entrapment doctrine, and not by a challenge to the substantive statute. We find that the defendant's RICO conviction must be sustained.[15]

## VI.

Corruption in public office, as manifested in the ABSCAM cases and here as well, must often be exposed through unconventional investigative techniques,[16] and the government treads a perilous course "between the trap for the unwary innocent and the trap for the unwary criminal," *Sherman,* 356 U.S. at 372, 78 S.Ct. at 821, between affording anticipatory opportunity to the willing wrongdoer and fabricating criminality from inherent human frailties. Public officials of reasonable honesty might often be led astray by sufficient and repeated inducements, or by plays upon character weaknesses that might otherwise have never come to light. The conduct displayed by the defendant, however, transgresses the permissible bounds of simple

---

**13.** At one point in their relationship, Carroll suggested to Redden the possibility of burning the Roxanne Club for the insurance, and Redden replied that his organization could arrange that. Of course, the arson was never carried out. Redden also told Carroll, after Thurston Watts had won $300 in one of their illegal poker games, that Watts could end up with "a fucked up jaw."

**14.** *See generally United States v. Gamble,* 737 F.2d 853 (10th Cir.1984) for a graphic example of how far government investigators have been allowed to proceed in an undercover "sting" without violating the constraints of due process.

**15.** The remaining RICO issues raised by the defendant, whether a judgeship can constitute an "enterprise" for RICO purposes, and whether multiple bribes may be treated as distinct felonies, have been *dispositively resolved by our decisions in United States v. Altomare,* 625 F.2d 5, 7 (4th Cir.1980), and *United States v. Karas,* 624 F.2d 500, 504 (4th Cir.1980), *cert. denied,* 449 U.S. 1078, 101 S.Ct. 857, 66 L.Ed.2d 800 (1981).

**16.** Notwithstanding the increasingly publicized use of the defense, it has been said that the "[e]ntrapment doctrine, standing alone, is no more than a curiosity, of more use to legal academics seeking tenure than to criminals seeking acquittals." L. Seidman, *supra,* n. 9, at 152.

weakness or naivete, and is particularly extraordinary for a holder of judicial office, who of all public officials must be held to the highest standard of incorruptibility. It is unnecessary for us to decide here how far the government may cast its nets in search of suspected corruption, for little indeed was required to expose Judge Hunt. We are resolved that the defendant's conviction must be affirmed.

AFFIRMED.

SPROUSE, Circuit Judge, dissenting:

I respectfully dissent. The analysis adopted by the majority concedes that hearsay evidence is incompetent to prove directly the predisposition of the defendant, but then effectively permits such use under the guise of admitting the hearsay as direct proof of governmental good faith, motive, and reasonableness. Moreover, I cannot accept the broad rule announced by the majority which apparently permits the government to introduce hearsay evidence on the good faith, motive, and reasonableness of its investigation whenever the defendant has alleged a violation of due process. The majority relies on *United States v. Webster*, 649 F.2d 346 (5th Cir.1981) (*en banc*), for support for its holding, but never identifies in this case the "special circumstances" creating a need for the hearsay evidence that outweighs its great prejudicial effect that the *Webster* court would require before admitting hearsay in an entrapment case. Because I believe that such special circumstances are absent here, I would reverse Hunt's convictions and remand the case for a new trial.

The basic rationale of the entrapment defense has not changed since it was repeated by Chief Justice Hughes in *Sorrells v. United States:*

> The first duties of the officers of the law are to prevent, not to punish crime. It is not their duty to incite to and create crime for the sole purpose of prosecuting and punishing it.... [I]t is unconscionable, contrary to public policy, and to the established law of the land to punish a man for the commission of an offense of

the like of which he had never been guilty, either in thought or in deed, and evidently never would have been guilty of if the officers of the law had not inspired, incited, persuaded, and lured him to attempt to commit it.

287 U.S. 435, 444–45, 53 S.Ct. 210, 213–14, 77 L.Ed. 413 (1932) (quoting *Butts v. United States*, 273 Fed. 35, 38 (8th Cir.1921) (Sanborn, J.)). When the defense is raised, "predisposition" of the defendant to commit the crime is, of course, the key element of the case. *United States v. Russell*, 411 U.S. 423, 433, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973); *Sorrells*, 287 U.S. at 451, 53 S.Ct. at 216. The defendant must initially present evidence " ' "that the Government's conduct created a substantial risk that the offense would be committed by a person other than one ready to commit it." ' " *United States v. Webster*, 649 F.2d 346, 349 (5th Cir.1981) (*en banc*) (quoting *United States v. Dickens*, 524 F.2d 441, 444 (5th Cir.1975) (quoting, in turn, *United States v. Mosley*, 496 F.2d 1012, 1014 (5th Cir.1974)), *United States v. Perl*, 584 F.2d 1316, 1321 (4th Cir.1978), *cert. denied*, 439 U.S. 1130, 99 S.Ct. 1050, 59 L.Ed.2d 92 (1979). After the defendant meets this burden, the government is required to prove beyond a reasonable doubt that the defendant was predisposed to commit the crime charged. *Webster*, 649 F.2d at 349; *Dickens*, 524 F.2d at 444.

Hunt's trial established conclusively that he took the bribes, and that government agents induced him to do so. The principal jury focus then was whether Hunt was predisposed to accept bribes. Hunt demonstrably is not a good citizen and certainly lacks the character required to hold even the minor judicial office to which he was elected. This, however, does not weigh on the principal issue. Hunt claims the government made him a criminal by manipulating his weak character. The government claims he was ready to commit the crimes and merely awaited the opportunity. The jury resolved the issue against Hunt and defeated his entrapment defense, but

the path to its decision was cluttered with gross hearsay evidence.

The principal issue on appeal, therefore, is whether the district court improperly admitted hearsay evidence on the issue of Hunt's predisposition to accept a bribe and thereby tainted the jury's decision. We look to the Federal Rules of Evidence governing the admission of hearsay evidence and to the Sixth Amendment's confrontation clause. Hearsay evidence is prohibited in the proof of predisposition unless it satisfies one of the exceptions to the general prohibition contained in the Federal Rules of Evidence. *Webster*, 649 F.2d at 349–50; *United States v. McClain*, 531 F.2d 431, 435–37 (9th Cir.), *cert. denied*, 429 U.S. 835, 97 S.Ct. 102, 50 L.Ed.2d 101 (1976); *United States v. Catanzaro*, 407 F.2d 998, 1001 (3d Cir.1969). The sixth amendment's proscriptions can be even stricter. *California v. Green*, 399 U.S. 149, 155–56, 90 S.Ct. 1930, 1933–34, 26 L.Ed.2d 489 (1970) (satisfying recognized hearsay exception does not automatically satisfy Confrontation Clause).

The familiar rules governing the admission of hearsay evidence must be applied carefully in an entrapment case because of their heightened susceptibility to abuse. The nature of the entrapment defense is such that by the time the predisposition issue is reached, the defendant has shown that government agents created the opportunity for the defendant's criminal conduct. At this point the trial process determines whether the government has crossed into the realm of "overzealous law enforcement," *Sherman v. United States*, 356 U.S. 369, 381, 78 S.Ct. 819, 825, 2 L.Ed.2d 848 (1958) (Frankfurter, J., concurring), by inducing into the scheme a person not otherwise disposed to commit the crime. In the course of this process, the trial court must make certain that the evidence presented is not a product of the same possibly excessive zeal. Good police investigation collects tips and other information of all degrees of reliability and from all shades of informants. The reliability of hearsay evidence that reaches police records via a chain of informants whose unavailability to testify has not been shown must be especially suspect and its use in an entrapment case subject to close examination.

At trial, the government adduced considerable direct evidence of Hunt's involvement in the bribe scheme—he took the payments, expressed interest in helping with the illegal enterprise, and never protested—and from this the jury was entitled to infer predisposition. *See United States v. Jannotti*, 673 F.2d 578, 604 (3d Cir.), *cert. denied*, 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982). Likewise, there was defense evidence negating predisposition— Hunt had a reputation for honesty, had never accepted a bribe before, initially resisted the bribes, and even tried to return the first payment; and the FBI pressured an intermediary to have Hunt accept the bribes. The trial, filtered of improper hearsay, presented a sharply drawn factual conflict for the jury to resolve. Our task on appeal, of course, is not to weigh the evidence but to judge the process by which the jury weighed it.[1] In my view, it was not possible for the jury to resolve the issue objectively because evidence on the question of Hunt's predisposition was irretrievably mixed with the most dubious sort of double and triple hearsay concerning his alleged corruptibility.[2]

---

1. Some indication of the jury's difficulty with this issue was that after two to three hours deliberation the jury requested the first instruction on the meaning of "predisposition". 3 Jt. App. at 1196, 1233–34.

2. Herein, I think, lies a failure on the part of the government to view its investigative role and prosecutorial role in the proper perspective. Good criminal investigatory techniques from time immemorial rely on information not only from good citizens, but also from informants from the most broken walks of life. From this sometimes inglorious ragbag, however, the dedicated police officer develops evidence that is worthy of consideration by judge and jury in the prosecutorial phase. Failing to properly develop respectable evidence, the police agency may not dump a ragbag of investigative leads on a jury.

The trial court permitted the jury to consider raw investigatory data that may well have been vital to initial police work but just as well could have been corrosive of the ultimate judicial truth-seeking process. The hearsay testimony of the three FBI agents overshadowed all of the evidence. Agent Drdak initiated the hearsay evidence, testifying on direct examination over defendant's objection that he heard from Agent Peters, who heard from local law enforcement officers, that Judge Hunt "had associated with criminal element there in Whiteville," "was involved from a financial standpoint in narcotics," and "had built a fairly good gun collection" from confiscated firearms. The hearsay continued during the direct examination of Agent Peters as he related the information he gave to Agents Drdak and Redden prior to the undercover operation. He testified about hearing from a sheriff who gave him a transcript of an interview with a woman who "was involved with" a cousin of Hunt who claimed Hunt had "taken care of" firearms charges against the cousin. He repeated the criminal association and confiscated weapons stories testified to by Drdak, citing as his source unnamed Columbus County and Whiteville law officers. Finally, Peters testified that a prison inmate named Edwards had alleged that Hunt was involved in drug transactions and had purchased an automatic weapon. Agent Redden repeated some of these statements in his testimony. None of the informants in the chain of transmitting this information testified and the government did not show their unavailability.

The government concedes, as well it should, that hearsay evidence may not be used to prove predisposition unless it is admitted under a constitutional exception to the general prohibition against its use contained in the Federal Rules of Evidence. *United States v. Webster,* 649 F.2d 346, 347 & n. 1 (5th Cir.1981) (*en banc*); *United States v. McClain,* 531 F.2d 431, 435–37 (9th Cir.), *cert. denied,* 429 U.S. 835, 97 S.Ct. 102, 50 L.Ed.2d 101 (1976); *United States v. Ambrose,* 483 F.2d 742, 750 (6th Cir.1973); *United States v. Catanzaro,* 407 F.2d 998, 1001 (3d Cir.1969); *Whiting v. United States,* 296 F.2d 512, 518–19 (1st Cir.1961). It argues, however, and the majority agrees that the hearsay introduced by the testimony of the three FBI agents was admissible because it was not offered to prove the truth of the statements asserted but merely to prove that the statements had been made and that the FBI agents were aware of them when the undercover operation was extended to induce Hunt to accept bribes. The majority holds that "where a defendant elects to challenge the government's conduct of an investigation, the government may introduce rebuttal evidence, even though it would amount to hearsay if it were introduced to prove the truth of matters asserted, for the limited purpose of demonstrating that the investigation was reasonable and free of improper motive."

The majority's holding incorporates two propositions. First, the government properly introduced this evidence for the jury's consideration because defense counsel "opened up" this line of inquiry by cross-examining agent Redden as to the basis of the investigation. Second, in the majority view, the evidence was relevant and admissable because Hunt claimed that the government's investigation was not instituted in good faith and therefore violated his due process rights.

I cannot agree that the defense "opened up" the evidence of FBI good faith on cross-examination so as to allow the agents on direct examination to relate all other completely unreliable hearsay information in their files.

The hearsay first came into evidence during the government's direct examination of agent Drdak, over objections to its hearsay character. Drdak was asked:

[Government counsel]: What did you learn from agent Peters about the judge?

[Defense counsel: Objection (hearsay)]

[The Court]: [T]his goes to .... state of mind.

[Defense counsel]: [P]redisposition deals with prior to the first act, not after the first act.

[Government counsel]: Predisposition, as I understand it, your honor, is synonymous with all the events that transpired between the individuals.

[The Court]: I'm going to overrule the objection. Weight for the jury.

2 Jt.App. at 482–83. Drdak then related much of the hearsay discussed, *supra.* It is true that on one occasion on cross-examination defense counsel asked agent Redden whether he was aware of any evidence of corruption on Hunt's part prior to the FBI investigation and his answer was "no." 1 Jt.App. at 228. This, however, was legitimate cross-examination on the issue of predisposition.

Furthermore, the Supreme Court in *Russell,* by focusing solely on the issue of defendant's predisposition, 411 U.S. at 433–35, 93 S.Ct. at 1643–45, makes it clear that the "agent's good faith, motive or reasonableness is of only secondary significance, if relevant at all". *United States v. Webster,* 649 F.2d 346, 351 (5th Cir.1981). The nature of police activity may be relevant to a due process attack, *United States v. Scott,* 678 F.2d 606, 612 (5th Cir.), *cert. denied,* 459 U.S. 972, 103 S.Ct. 304, 74 L.Ed.2d 285 (1982); *Webster,* 649 F.2d at 351 (to rebut defendant's assertions of bad faith or improper motive), but on the issue of entrapment its probative value is questionable and its "prejudicial effect ... is likely to be great because the jury might consider it as evidence of predisposition or of bad character." *Webster,* 649 F.2d at 351; *see United States v. Catanzaro,* 407 F.2d 998, 1001 (3d Cir.1969). This use of hearsay also denies the defendant an opportunity to establish by cross examination of police sources information that might support an asserted lack of predisposition to commit the crime instigated by the police.

Likewise, I cannot agree that Hunt opened the door to a flood of hearsay by raising a due process claim. Hunt's motion for dismissal on the grounds that the FBI's investigative conduct amounted to a denial of due process was a pretrial motion. He never raised that issue during trial and even had he done so, it would have been egregious procedural error to submit that legal issue to the jury. In deciding the merits of the claim, there were any number of ways for the trial court to develop relevant facts without tainting the jury's entrapment deliberation. The effect of the majority's opinion is to require Hunt to choose between an entrapment defense and a constitutional due process claim.

It is possible that the defense in some exceptional case might "open up" an issue of government "good faith" so as to permit the introduction of some hearsay evidence in rebuttal. I feel, however, that this is not such a case and above all that we should not establish the broad rule announced by the majority.