953 F.2d 640
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
William G. GRAVES, Jr., Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Fernando HOLGUIN, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Sharon Peeples HOLGUIN, Defendant-Appellant.
 Nos. 91-5009, 91-5010 and 91-5026.
 United States Court of Appeals, Fourth Circuit.
 Argued Dec. 5, 1991.
Decided Jan. 17, 1992.
 
 Appeals from the United States District Court for the District of Maryland, at Baltimore, No. CR-90-221-JH, Joseph C. Howard, District Judge.
 Argued: R. Kenneth Mundy, Mundy, Holt & Mance, Washington, D.C., for appellant Graves; Jay Fred Cohen, Baltimore, Md., for appellant Fernando Holguin; Jocelyn Nettles Sands, Washington, D.C., for appellant Sharon Holguin; Christine Manuelian, Assistant United States Attorney, Baltimore, Md., for appellee.
 On Brief: Richard D. Bennett, United States Attorney, Barbara S. Skalla, Assistant United States Attorney, Baltimore, Md., for appellee.
 D.Md.
 AFFIRMED.
 Before ERVIN, Chief Judge, and PHILLIPS and SPROUSE, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 Fernando Holguin (Mr. Holguin), Sharon Holguin (Mrs. Holguin), and William Graves (Graves) appeal their several convictions of conspiracy to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846, possession of cocaine in violation of 21 U.S.C. § 846, money laundering in violation of 8 U.S.C. § 1956, and income tax evasion in violation of 26 U.S.C. § 7201. Finding no error by the district court with respect to any of the seven grounds for appeal, we affirm on all counts.
 
 
 2
 * Native Colombian Mr. Holguin came to the United States in 1979. He married Sharon Peeples (later Mrs. Holguin) to establish residency. The Holguins moved into an apartment in Montgomery County, Maryland, and they began selling cocaine obtained from Mr. Holguin's sources in Miami and New York. The sale of cocaine was the couple's sole source of income during the early 1980's. Mrs. Holguin introduced Mr. Holguin to customers in the area, and she assisted him with his selling activities.
 
 
 3
 In 1984, Mr. Holguin formed International Fashions, Ltd., a Maryland corporation. This corporation existed until 1988, when Holguin opened a storefront business called Sport's Designer in Silver Spring, Maryland. Sales records introduced at trial suggested that the Holguins used both businesses as "fronts" for selling drugs. The Holguins sold drugs regularly to at least six people, and these regular customers occasionally participated more closely in the Holguins' drug operation.
 
 
 4
 Raymond Merritt was employed in the Holguins' drug enterprise. In the early 1980's, Merritt bought 1 to 3.5 grams of cocaine each week from Mrs. Holguin's cousin, Reggie Peeples, who was selling for the Holguins. Peeples introduced Merritt to the Holguins, and Merritt began buying cocaine directly from them. Mrs. Holguin served as Merritt's main contact in the drug enterprise. Merritt later worked as Mr. Holguin's bodyguard, and Mr. Holguin paid Merritt in cash or cocaine. Merritt continued purchasing approximately seven grams of cocaine per week from Mr. Holguin and making cocaine deliveries for Mr. Holguin until late 1986.
 
 
 5
 In late 1986, Mr. Holguin returned to Colombia for approximately one year. During his absence, Mrs. Holguin collected rent from real property which Mr. Holguin had purchased. Upon his return in September of 1987, he resumed living with his wife, but their marriage was failing. Sometime in 1988, Mr. Holguin began to hide the details of his drug sales from his wife. However, he continued to give support payments obtained, at least in part, from his drug sales. Although her participation was less active, Mrs. Holguin remained involved in the drug enterprise through 1988.
 
 
 6
 After Mr. Holguin returned to the United States, Merritt reestablished contact with Mr. Holguin through Mrs. Holguin, and Merritt began purchasing cocaine from him again. Merritt continued to purchase from 8 to 12 ounces each week. Mr. Holguin used an electronic pager or cellular phone to conduct sales, and he recorded cocaine sales on a yellow legal pad, using initials to represent the buyers' identities.
 
 
 7
 William "Bootsie" Graves, Mrs. Holguin's cousin, was also employed in the Holguins' cocaine distribution scheme. Holguin paid Graves to run "errands" for him. Graves was the listed subscriber for at least two electronic pagers, one of which was used by Mr. Holguin. Graves purchased cocaine from Holguin and resold it to, among others, Terry Galloway, Guy Holcomb, and George Steele. In the summer of 1988, Graves expressed interest in buying Steele's Porsche for 2 kilos of cocaine. Graves owned a number of luxury automobiles, but the transaction with Steele was never consummated.
 
 
 8
 In late 1988, Mr. Holguin began using the apartment of Carmen Nunez and Christina Rios as a "stash house." Nunez and Rios received cocaine as rent, and Nunez made at least two deliveries of cocaine for Mr. Holguin.
 
 
 9
 During the summer of 1989, Mr. Holguin met Fernando Hurtado, a confidential informant for the Internal Revenue Service, the United States Customs Service, the Drug Enforcement Agency, and the Montgomery County Police. Hurtado posed as a Bolivian cocaine distributor. Mr. Holguin told Hurtado that he needed an alternate source for cocaine because his connections in Miami and New York were being cautious. Mr. Holguin discussed his money laundering schemes with Hurtado and offered to launder Hurtado's drug profits through overseas bank accounts. Mr. Holguin told Hurtado that he had made two to three million dollar cocaine transactions in the past.
 
 
 10
 In September of 1989, Mr. Holguin negotiated for the purchase of 50 kilos of cocaine from Hurtado for $500,000, but Holguin later reduced his request to 25 kilos for $300,000. Mr. Holguin arranged to launder the funds through an overseas bank.
 
 
 11
 In November, Mr. Holguin directed Rios and Gina Green to wire $19,300 in drug proceeds to what Holguin thought was Hurtado's bank account in the Cayman Islands. The account was actually an undercover account used by the United States Customs Service. Mr. Holguin gave Hurtado $12,200 in cash on November 16, 1989. The next day, government officials conducted a controlled delivery of 25 kilos of cocaine. Mr. Holguin gave Hurtado approximately $70,000, and he was arrested after he took possession of the cocaine.
 
 
 12
 On May 31, 1990, the Grand Jury returned a multi-count indictment against six persons alleged to have conspired to sell cocaine as part of an enterprise led by Mr. Holguin. Rios, Green, and Merritt entered guilty pleas. After a lengthy trial, the jury returned the following verdicts: Mr. Holguin was found guilty of conspiring to distribute and possess with intent to distribute cocaine, unlawfully attempting to possess with intent to distribute cocaine, laundering money, structuring a financial transaction in violation of 31 U.S.C. § 535(3), conducting a criminal enterprise in violation of 21 U.S.C. § 848, and evading federal income tax in 1988; Graves was found guilty of conspiracy, possession, money laundering, and federal income tax evasion during the years 1987, 1988, and 1989. Mrs. Holguin was found guilty of conspiracy. Each defendant was sentenced in accordance with the United States Sentencing Guidelines.
 
 
 13
 Defendants appeal their convictions on different grounds.
 
 II
 
 14
 We reject each of Mr. Holguin's four grounds for appeal.
 
 
 15
 * Mr. Holguin argues that there was insufficient evidence to support the existence of a single conspiracy rather than loosely connected, multiple conspiracies. In reviewing a verdict on sufficiency grounds, we must ask whether a reasonable juror, viewing the evidence in the light most favorable to the government, could rationally find the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). The government presented extensive evidence of continuing relationships between six alleged co-conspirators. Holguin argues that the initial conspiracy ended when he left the country and lived in Colombia for one year. However, a single conspiracy need not be uninterrupted. United States v. Urbanik, 801 F.2d 692, 696 (4th Cir.1986). In addition, Mr. Holguin never repudiated the ongoing conspiracy by actively withdrawing himself from his relationship with his co-conspirators. He could not end his role in the conspiracy or the conspiracy itself without actively disavowing his continuing drug associations. United States v. Sheffer, 896 F.2d 842 (4th Cir.1990).
 
 
 16
 The district court instructed the jury on the requirements for finding a single conspiracy, and Mr. Holguin did not object to the instruction. Therefore, we find no error in Mr. Holguin's conviction for participating in a single conspiracy.
 
 B
 
 17
 Mr. Holguin contends that the district court erred in failing to instruct the jury on the entrapment defense. We review the district court's refusal de novo, asking whether there was legally sufficient evidence from which a reasonable juror could find entrapment. Mathews v. United States, 485 U.S. 58, 62 (1988). To prove entrapment as an affirmative defense, Mr. Holguin must show that the government induced him to engage in the criminal act and that he lacked the predisposition to commit the act. United States v. Hunt, 749 F.2d 1078, 1084-85 (4th Cir.1984).
 
 
 18
 Mr. Holguin presented evidence at trial that during their discussions about a cocaine purchase, Mr. Holguin told Hurtado that "I was in peace and you got me working again." Weighed against testimony by Hurtado that Mr. Holguin discussed his past drug purchases and offered to launder Hurtado's drug proceeds, Mr. Holguin's statement is unpersuasive. Mr. Holguin's background and his interaction with Hurtado establish that he was predisposed to enter into a large-scale purchase of cocaine without the inducements of the government. Therefore, the district court did not err in denying Mr. Holguin's request to instruct the jury on the entrapment defense.
 
 C
 
 19
 Mr. Holguin contends there was insufficient evidence to convict him of money laundering in violation of 18 U.S.C. § 1956. We disagree. Mr. Holguin argues that his denial of the money laundering charge posed a sufficiency problem. However, records from Mr. Holguin's two "front" businesses and testimony of co-conspirators were sufficient for a reasonable juror, viewing the evidence in the light most favorable to the government, to find Mr. Holguin guilty beyond a reasonable doubt of money laundering. Jackson v. Virginia, 443 U.S. 307, 319 (1979).
 
 D
 
 20
 Mr. Holguin challenges the district court's failure to appoint new counsel for him without hearing his complaints about his lawyer. We review the district court's denial of Holguin's request for an abuse of discretion. United States v. Gallop, 838 F.2d 105, 108 (4th Cir.1988).
 
 
 21
 Five days before trial, Mr. Holguin wrote a letter to the district court requesting a new attorney. He wrote that his defense was compromised because his attorney was not spending enough time on the case. The district court judge held a conference in chambers with Mr. Holguin's attorney and the prosecuting attorney. The prosecutor told the judge that Mr. Holguin had previously rejected five attorneys. Although he did not hear Mr. Holguin's on the issue, the district court judge considered Mr. Holguin's request by reading the defendant's letter and speaking with counsel. Under the circumstances, we find the district court was well within its discretion in denying Mr. Holguin's request for new counsel. A criminal defendant is not absolutely entitled to the lawyer of his choice. Gallop, 838 F.2d at 108.
 
 III
 
 22
 Mrs. Holguin contends that the district court erred in sentencing her under the federal sentencing guidelines. She maintains that her involvement in the conspiracy ended before November 1, 1987, the day the sentencing guidelines became effective. On appeal, our review of the sentence is limited to a determination of whether the sentence was imposed "in violation of law." 18 U.S.C. § 3742(e). Unless it is clearly erroneous, we must accept the court's factual determination of the date Mrs. Holguin ended her participation in the conspiracy. United States v. Vinson, 886 F.2d 740, 742 (4th Cir.1989).
 
 
 23
 Mrs. Holguin maintains that her role in the conspiracy began when she met her husband in 1982 and ended when her husband left for Colombia in 1986. However, Mrs. Holguin failed to affirmatively disavow her role in the conspiracy. United States v. Watford, 894 F.2d 665, 670-71 (4th Cir.1990). Even ceasing activities with other conspirators is insufficient. United States v. Walker, 796 F.2d 43, 49 (4th Cir.1986). We reject Mrs. Holguin's argument that her husband effectively ended her role in the conspiracy when he left the United States in 1986.
 
 
 24
 We find no clear error in the district court's factual finding that Mrs. Holguin continued her role in the conspiracy at least until 1988. After her husband returned to the United States in 1987, Mrs. Holguin helped Merritt contact him in connection with drug transactions and she continued to receive support payments from Mr. Holguin through 1988. Therefore, the district court properly sentenced her in accordance with the United States Sentencing Guidelines.
 
 IV
 
 25
 We reject each of the three grounds of appeal presented by Defendant Graves.
 
 
 26
 * Graves fails to show that the district court erred in rejecting his motion for a judgment of acquittal on the conspiracy count. We review Graves' challenge by asking whether the evidence, when viewed in the light most favorable to the government, would warrant the jury's finding the defendant guilty beyond a reasonable doubt. Burks v. United States, 437 U.S. 1, 16 (1978). We find sufficient evidence on the record to justify the district court's decision to deny a motion for acquittal and to submit the conspiracy charge to the jury.
 
 
 27
 Numerous co-conspirators testified that Graves met regularly with Mr. Holguin and that Graves purchased drugs from Mr. Holguin. Graves' purchasing behavior changed during the time Mr. Holguin was in Colombia. The government also presented undisputed evidence that one of the pagers used by Mr. Holguin for sales activities was registered to Graves and that Graves ran "errands" for Holguin.
 
 
 28
 Graves contends that this evidence only suffices to show that he had a purchaser/seller relationship with Holguin, but we disagree. From the evidence that Holguin's pager was registered to Graves and that he acted under Holguin's directions in running drug-related errands, coupled with Graves' purchases of drugs from Holguin for resale, a jury properly could infer that Graves and Holguin were acting in concert in a drug distribution scheme.
 
 B
 
 29
 Graves contends that there was insufficient evidence to support his conviction of tax evasion during the calendar years 1987, 1988, and 1989.
 
 
 30
 In order to prove income tax evasion under 26 U.S.C. § 7201, the government must show the existence of a tax deficiency, willfulness, and an affirmative act to evade taxes. Spies v. United States, 317 U.S. 492, 499 (1943). The government's expert witness used the expenditure method of proof to establish a discrepancy between Graves' claimed and actual expenditures. We can infer willfulness from evidence that a defendant spent large amounts of cash to avoid keeping records of his expenditures. United States v. Daniels, 617 F.2d 146, 150 (5th Cir.1980). Graves' expenditures on luxury cars were largely unreported. Finally, we may find an affirmative action of evasion in "any conduct, the likely effect of which would be to mislead or conceal." Spies, 317 U.S. at 499. Graves misled the government by filing tax returns which significantly understated his actual income. Sansone v. United States, 380 U.S. 343, 352 (1965).
 
 C
 
 31
 Graves contends that the district court erred by admitting expert testimony as to the meaning of symbols used in Mr. Holguin's ledger. We review the district court's admission of expert testimony for an abuse of discretion. United States v. Jones, 913 F.2d 174, 177 (4th Cir.1990).
 
 
 32
 Graves challenges the expert testimony of Montgomery County policeman Christopher Sakala. The government qualified Sakala as an expert in drug transactions and drug enterprises. Sakala testified that the "B" on Holguin's record of drug sales probably stood for "Bootsie," Graves' nickname. Sakala inferred this from Ray Merritt's testimony that he took part in the sales marked with an "R". An expert can render his opinion on an ultimate issue in the case as long as he does not testify as to the defendant's state of mind. Fed.R.Evid. 704. We have approved the use of expert testimony in aiding the jury's understanding of drug trafficking organizations. See, e.g., United States v. Safari, 849 F.2d 891, 895 (4th Cir.1988). While this expert testimony may not have been essential to the jury's understanding of the evidence, we do not believe the jury was disserved or misled by Sakala's opinion. Therefore, the district court did not abuse its discretion in admitting this testimony.
 
 V
 
 33
 For the foregoing reasons, we affirm the convictions of Fernando Holguin, Sharon Holguin, and William Graves on all counts.
 
 
 34
 AFFIRMED.