678 F.2d 606
 10 Fed. R. Evid. Serv. 1155
 UNITED STATES of America, Plaintiff-Appellee,
v.
Peter James SCOTT, Don Richard Rainey, Steven Clyde Watson,
Daniel Edwin White, Gary Lee Anderson, Charles Joseph
Howard, Julio Rodrigues, Pedro Aparicio, Luis Garcia,
Charles Thomas Pollard, Fermin Gomea Polo and Lawrence W.
Griffith, Defendants-Appellants.
 No. 81-2397.
 United States Court of Appeals,
Fifth Circuit.
 June 18, 1982.
 
 Mark Vela, Michael A. Maness, Houston, Tex., for defendants-appellants.
 Daniel K. Hedges, U.S. Atty., George O. Jacobs, Asst. U.S. Atty., Houston, Tex., Mervyn Hamburg, Atty., U.S. Dept. of Justice, Washington, D. C., for plaintiff-appellee.
 Appeal from the United States District Court for the Southern District of Texas.
 Before THORNBERRY, GEE and GARWOOD, Circuit Judges.
 GEE, Circuit Judge:
 
 
 1
 Twelve appellants seek reversal of their convictions of conspiracy to import and to possess, with intent to distribute, over fifteen tons of marihuana. Their primary complaint is of the sufficiency of the evidence to support the convictions. Concluding that it is sufficient to support five of the convictions only and that the other points raised by these five do not warrant reversal, we affirm as to them and reverse as to the others.
 
 Facts
 
 2
 On March 31, 1981, Appellant Pollard inquired locally regarding pleasure boats available for purchase in the area of Freeport, Texas, inspecting two of them the same day. He indicated an interest in a fishing charter-boat venture, in personal use, and in a possible tax write-off. The following day, after a fifteen-minute tour of the vessel, he agreed to purchase the 41-foot Hattaras class TYRANT III for a total of $78,500.00, payable the following day by cashier's check. On this occasion, he was accompanied by appellant Scott. The next day, an hour late for the closing, he called the seller, advising that he was running late and inquiring if cash would be acceptable. Told that it was, he and another individual arrived and paid in full. The seller offered to accompany Pollard to the Coast Guard station to register the title transfer and to give Pollard a receipt for his cash. Pollard refused both, saying that he trusted the seller by reputation and that he wished to find a place to moor the boat. They agreed to meet the next morning for the seller to remove his personal property from the boat, Pollard taking the ignition keys and unexecuted title papers.
 
 
 3
 That morning, April 3, found the TYRANT III gone, however, not to return that day or the next. On the evening of April 5, the seller called Pollard's home, reaching his wife, who told him that Pollard had left three days before to fish. In response to the seller's complaints about his missing personal property and expressed intent to contact the Coast Guard, Mrs. Pollard requested that he not do so-an action that seemed strange to the seller in view of Pollard's long absence in rough weather. She promised on Pollard's behalf that the property would be returned by noon the next day. By the afternoon of that day, however, TYRANT III was in the hands of the Coast Guard, as we shall see.
 
 
 4
 In the meantime, Pollard had purchased yet another small pleasure vessel, the 45-foot DORADO, after a brief inspection. Payment of $107,000.00 cash was made on April 2. Pollard, accompanied again by appellant Scott, accepted a receipt for the sum but postponed transferring title. Next evening, Scott and appellant White departed in it, returning in the early hours of April 5, a Sunday. At that time, they were seen in the company of appellant Griffith. Early that Sunday afternoon, DORADO left the slip, never to return.
 
 
 5
 Earlier that Sunday morning, the Galveston Coast Guard station had begun to pick up unusual signals on a frequency which it was monitoring, 14.3670 megahertz. These were between two stations described only as "105" and "115," 105 being apparently shore-based and 115 being a vessel trying, with some difficulty, to rendezvous with two others in the Gulf of Mexico. At one point on the morning of Monday, April 6, 105 inquired of 115 whether it had on its radar screen an offshore oil field known as the Buccaneer Rigs. 115 responded affirmatively and stated: "I am at 5622 and 1081.5. You know what I mean." From this communication the Coast Guard operator assumed these numbers referred to partial Loran-C navigational positions; and they plotted 115's gulf location at about 8-10 miles south-southeast of the Buccaneer offshore oil field, beyond Galveston. A Coast Guard helicopter was dispatched to the area. Later that morning the Coast Guard also intercepted radio communications on VHF channel 9 apparently between two surface vessels identified only as "Deadend" and "Willie Willie." The name Willie had been mentioned several times during the course of communications between 105 and 115.
 
 
 6
 The Coast Guard helicopter arrived in the vicinity at about 2:16 p. m. Initially, the helicopter crew observed a workboat tied up to the southernmost production platform in the Buccaneer field. Later the crew observed what was subsequently identified as the vessel LITTLE AL, a somewhat battered shrimper, approximately five miles south-southeast of the Buccaneer rigs and the TYRANT III and DORADO some ten miles further east. As the helicopter overflew LITTLE AL at approximately 2:25 p. m., shore-based Coast Guard radio operators overheard the following communication from "115": "Red stripe is here. The same dude." (Obviously a reference to the red stripe marking borne by all Coast Guard surface vessels and aircraft.) Moments later Coast Guard officers overheard "Deadend" inform "Willie Willie" that "Red stripe is here." A short time thereafter, 105 instructed 115 to "go take a ride" with Willie Willie and "take all the papers off."
 
 
 7
 The Coast Guard helicopter remained in the vicinity to observe the movements of the three vessels. TYRANT III proceeded directly to LITTLE AL and came alongside the larger vessel at approximately 3:09 p. m., remaining alongside for about five minutes. It then departed to the southwest. The Coast Guard helicopter departed the vicinity for refueling shortly thereafter.
 
 
 8
 In the meantime, the Coast Guard diverted another aircraft, a C-131 stationed at Corpus Christi, to the area. The C-131 was on the scene when the helicopter returned from refueling. The C-131 observed the movements of LITTLE AL, TYRANT III, and DORADO from approximately 3500 feet altitude. Shortly after 4 p. m., the C-131 observed TYRANT III and DORADO come stern to stern. While they were so rendezvoused, crewmembers on the C-131 observed an object being thrown overboard between the two vessels. After jettisoning the object, the two vessels proceeded away from each other; then after some erratic course maneuvers they again met briefly for a second time. The Coast Guard helicopter subsequently retrieved the object, a roll of heavy plastic sheeting.
 
 
 9
 While Coast Guard aircraft continued to observe the movements of the vessels, a 41-foot Coast Guard surface vessel arrived, and officers boarded LITTLE AL, which was found to be unmanned but laden with 30,000 pounds of marihuana. They also discovered maps charting a nautical course from the Colombian coast to the vessel's location. Thereupon, the 41-foot Coast Guard vessel moved to intercept TYRANT III and to board her as well. The helicopter intercepted DORADO, which was at that time some four to five miles distant from TYRANT III and instructed it to return to the location of the Coast Guard vessel and TYRANT III to prepare for boarding by the Coast Guard. Officers of the Coast Guard then boarded both vessels. No violations of Coast Guard safety regulations or illegal contraband were found on either, although officers noted that the cabin areas of both vessels had been "stripped," i.e., that there was very little furniture in the cabin areas. Officers also observed sophisticated radio equipment on board.
 
 
 10
 The captain of the 41-foot Coast Guard vessel did not elect to seize the two sport fishing vessels and their crew at that time, however. Instead, he was returning to LITTLE AL to retrieve a crewmember left to stand watch when orders were received from the Coast Guard station in Galveston to take TYRANT III, DORADO, and their passengers into custody and escort the vessels back to Galveston.
 
 Sufficiency of the Evidence: Law
 
 11
 Appellants attack the record evidence as insufficient to support these convictions, laying stress on its character as chiefly circumstantial, as indeed it is. Its character as such was once of key significance in our circuit: at one time we tested such evidence by an objective rule, applied by our judges, that to support a conviction such evidence must of itself exclude every reasonable hypothesis other than that of guilt. See, e.g., Riggs v. United States, 280 F.2d 949, 955 (5th Cir. 1960). Such evidence was thus subjected to a severe test, one of an all but mathematical quality. This is, however, our law no longer. Over a decade ago, in United States v. Warner, 441 F.2d 821, 825 (5th Cir. 1971) (per Wisdom, J.), cert. denied, 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58 (1971), we recognized the command of the Supreme Court[1] that "circumstantial evidence is intrinsically no different from testimonial evidence ...." Thus the rule by which it is to be tested is the same as the rule obtaining as to evidence generally: whether a reasonably-minded jury could accept the record evidence as adequate and sufficient to support the conclusion of guilt beyond a reasonable doubt. United States v. Warner, supra. We therefore suggest to counsel that in future such differential attacks on evidence as circumstantial be abandoned. As our decision should serve to indicate, they proceed from no specially advantageous ground. Bearing these observations in mind, then, we turn to the quality and quantity of evidence supporting the convictions in hand.
 
 Sufficiency of the Evidence: Facts
 
 12
 Appellants claim the benefit of the well-established rule that "mere presence, association, acquiescence or approval without more is not sufficient to establish that a defendant is a member of (criminal) conspiracy." E.g., United States v. Macker, 608 F.2d 223, 227 (5th Cir. 1979). At trial, the evidence presented by the prosecution, in addition to radio communication evidence substantiating the surveillance described above, was: (1) appellants Pollard's and Scott's cash purchase of the TYRANT III on April 1 under suspicious circumstances; (2) appellant Pollard's and Scott's cash purchase of the DORADO on April 2 under like circumstances; (3) the "extraordinary" absence of salon furniture and sailing-fishing equipment from the TYRANT III and DORADO, along with the presence of abundant clear plastic sheeting-both consistent with the presumed loading of marihuana; (4) the TYRANT III's rendezvous with the drug-laden LITTLE AL; (5) the presence of finger and palm prints of appellants Griffith and Aparicio on items found aboard the LITTLE AL; and (6) the fact that both the TYRANT III's and the DORADO's sophisticated radios had dials set at identical frequencies on their radio bands.
 
 
 13
 This evidence, tested against the standard of "proof beyond a reasonable doubt that a conspiracy existed, that the accused knew it and with that knowledge voluntarily joined it," United States v. White, 569 F.2d 263, 267 (5th Cir. 1978), cert. denied, 439 U.S. 848, 99 S.Ct. 148, 58 L.Ed.2d 149 (1978), is scarcely crushing. Nevertheless, viewing it in the light most favorable to the jury verdict, we conclude that it is easily sufficient, with regard to the convictions of appellants Pollard, Scott, Griffith, White and Aparicio, for a reasonably-minded jury to find guilt beyond a reasonable doubt. The circumstances surrounding the hasty cash purchases of the two vessels by Pollard and Scott, together with the vessels' subsequent erratic actions at sea certainly go far to "exclude every reasonable hypothesis inconsistent with innocence ..." United States v. Bland, 653 F.2d 989, 995 (5th Cir. 1981), cert. denied --- U.S. ----, 102 S.Ct. 602, 70 L.Ed.2d 592 (1981). The evidence with regard to appellant Daniel White, who accompanied Scott to pick up the DORADO under apparently surreptitious circumstances is also consistent with knowledge and participation in the conspiracy. Similarly, appellants Griffith and Aparicio's fingerprints on items aboard the LITTLE AL, a drug-laden vessel that had just completed the long voyage from South America, also appears sufficient to support a conviction of conspiracy to import and possess. See, e.g., United States v. Freeman, 660 F.2d 1030 (5th Cir. 1981); United States v. Alfrey, 620 F.2d 551, 556 (5th Cir. 1980), cert. denied, 449 U.S. 938, 101 S.Ct. 337, 66 L.Ed.2d 160 (1980). The question with regard to Griffith and Aparicio is somewhat closer, since the prosecution could not prove when these appellants touched the items on the LITTLE AL. While the prints are somewhat consistent with appellants' hypothesis that they both merely boarded the LITTLE AL out of curiosity and promptly left when they realized that it was laden with marihuana, this explanation need not have been accepted by the jury, given the fact that Griffith's prints were found on several items not likely to have been touched during a cursory inspection of a boat at sea (e.g., a can inside a drawer, a jar in the galley).
 
 
 14
 With regard to the other appellants, those aboard the TYRANT III or the DORADO when they were seized, the prosecution offered nothing beyond their mere presence. Neither the TYRANT III nor the DORADO contained any drugs whatever, and the prosecution offered nothing to show that these appellants knew of the smuggling operation. For all we know, these people may have simply been hired "to unload a vessel." If so, they may have been wholly innocent of any wrongdoing at the time of arrest, since they would not have discovered that the unloading involved drugs until the operation actually got underway. Unlike Griffith and Aparicio, who we know must have been aware of the drugs aboard the LITTLE AL, and Pollard, White, and Scott, who apparently knew of the scheme from the very beginning, the rest of appellants were more like such passengers in an automobile containing concealed contraband as we have in other cases held innocent of possession. See, e.g., United States v. Ferg, 504 F.2d 914 (5th Cir. 1974). Their convictions must be reversed.
 
 Other Contentions
 
 15
 Appellants claim, first, that the Coast Guard lacked probable cause to seize the TYRANT III and DORADO and, second, that a determination of the existence of probable cause was improper absent a showing of who ultimately made the decision to seize the vessels. They therefore argue that their arrests were unlawful and all evidence obtained therefrom should have been suppressed. The prosecution claims that with the exception of appellants Griffith and Aparicio, who provided their fingerprints for comparison with those found on the LITTLE AL, none of the appellants even have standing to assert the legitimate expectation of privacy necessary to invoke a right to suppress. Whether or not the prosecution's claim of lack of standing is correct-and it contains much force-the standing issue is academic.[2] What the Coast Guard observed during its long period of surveillance was amply sufficient to warrant a reasonable person's belief that an offense was being committed. The fact that the particular individual who ordered the seizure was not identified does not prevent an objective evaluation of the facts generally known to the Coast Guard when it acted; and where its agents are in communication with each other, their knowledge may properly be viewed in the aggregate when being tested for sufficiency to base such a conclusion. United States v. Wright, 588 F.2d 189 (5th Cir. 1979); United States v. Nieto, 510 F.2d 1118 (5th Cir. 1975), cert. denied 423 U.S. 854, 96 S.Ct. 101, 46 L.Ed.2d 78 (1975); Moreno-Vallejo v. United States, 414 F.2d 901 (5th Cir. 1969), cert. denied, 400 U.S. 841, 91 S.Ct. 82, 27 L.Ed.2d 76 (1970). Finally, appellants claim that it was error to admit evidence of the radio communications of the purported coconspirators because (1) these were only conditionally relevant and were not authenticated, as required by Fed.R.Evid. 104(b) and 901(a); (2) these transmissions, to the extent that they contained extrajudicial assertions of fact, were hearsay and were admitted in violation of United States v. James, 590 F.2d 575 (5th Cir. 1979) (en banc), cert. denied, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979); and (3) at least part of the evidence was based on double hearsay and was therefore inadmissible.
 
 
 16
 Appellants' first and second arguments are not without plausibility. All that the prosecution did here was put on a witness who could confirm only that radio communications between unknown parties were indeed overheard. Under Fed.R.Evid. 104(b) and 901(a), however, evidence of, telephone communications must, as a condition precedent to admission, be authenticated by, for example, "evidence that a call was made to the number assigned at the time by the telephone company to a particular person or business, if (A) in the case of a person, circumstances, including self-identification, show the person answering to be the one called, or (B) in the case of a business, the call was made to a place of business and the conversation related to business reasonably transacted over the telephone." Fed.R.Evid. 901(b)(6). The prosecution here offered nothing to identify the parties to the overheard communications and apparently did not even demonstrate that the radios aboard the TYRANT III, DORADO and LITTLE AL were capable either of communicating with one another or of transmitting on 14.3670 megahertz or channel 9, VHF. This last prosecutorial omission seems strange indeed, as the government presumably had all the radio equipment in its possession at the time of trial.
 
 
 17
 The government's rejoinder to the appellants' argument is that the radio communication evidence came in not to prove the truth of the matter asserted, e.g., that the vessels were indeed at 5622 and 1081.5 Loran-C positions, but to explain why the Coast Guard undertook its investigation. There is precedential support for this position, see, e.g., United States v. Vitale, 596 F.2d 688 (5th Cir. 1979), cert. denied, 444 U.S. 868, 100 S.Ct. 143, 62 L.Ed.2d 93 (1979), and we conclude that, in view of the strength of the evidence against those whose convictions we affirm, any error in admitting these rather ambiguous transmissions was harmless. The same is true of appellants' third objection to some of this evidence as double hearsay. See United States v. Wilkerson, 469 F.2d 963 at 968 (5th Cir. 1972), cert. denied, 410 U.S. 986, 93 S.Ct. 1515, 36 L.Ed.2d 184 (1973) ("no reversible error in admitting this technically inadmissible statement of Branum," (emphasis added); a double hearsay case).
 
 
 18
 AFFIRMED in part and in part REVERSED.
 
 
 
 [1]
 Holland v. United States, 348 U.S. 121, 140, 75 S.Ct. 127, 139, 99 L.Ed. 150 (1954)
 
 
 [2]
 Appellants Pollard and possibly others involved in the purchase of the TYRANT III and the DORADO may have shown a legitimate possessory interest in the boats sufficient to permit them to invoke their right to suppress evidence obtained from the seizures. Although legal title to the vessels never passed to any appellant, legal title is not the exclusive means of showing a "legitimate possessory interest." See, e.g., United States v. Dunn, 674 F.2d 1093 (5th Cir. 1982); United States v. Whitley, 670 F.2d 617 (5th Cir. 1982)