Donald TANGWALL, Plaintiff–Appellee,

v.

Thomas STUCKEY, Defendant–Appellant.

No. 96–2960.

United States Court of Appeals,
Seventh Circuit.

Argued April 2, 1997.

Decided Feb. 2, 1998.

Kathleen T. Zellner (argued), Daniel W. Pisani, Zellner & Associates, Naperville, IL, for Plaintiff–Appellee.

Nancy J. Wolfe (argued), Alison I. Abel, Office of the States Attorney of DuPage County, Wheaton, IL, for Defendant–Appellant.

Before WOOD, Jr., COFFEY and EASTERBROOK, Circuit Judges.

COFFEY, Circuit Judge.

In September of 1994, plaintiff-appellee, Donald Tangwall, filed suit under 42 U.S.C. § 1983, alleging that the defendant-appellant, Detective Thomas Stuckey, while acting as an employee of the DuPage County Sheriff's Department, arrested him without probable cause in violation of the Fourth and Fourteenth Amendments to the United States Constitution. The complaint also set forth supplemental state claims of false imprisonment, malicious prosecution and wanton and willful conduct against Detective Stuckey,[1] as well as claimed that the County of DuPage was vicariously liable for the Detective's actions. Detective Stuckey, asserting both qualified immunity under § 1983 and an "advice of counsel defense," and the County of DuPage each filed motions for summary judgment. The trial court denied Stuckey's motion and granted DuPage County's.[2] Detective Stuckey appeals the former of those two determinations.[3] We reverse.

## I. BACKGROUND

On July 16, 1992, an unknown assailant sexually attacked Valerie Smith while she was walking in an area known as the Prairie Path in Carol Stream (DuPage County), Illinois. After the assault, Smith, extremely upset, covered with mud, and crying so hard she was almost speechless, proceeded to a friend's house; this friend, in turn, called the police. Several officers, Detective Stuckey not being among them, arrived at the friend's house and requested that Smith return to the scene of the attack. She accompanied the officers back to the Prairie Path and recounted the event to them, describing her assailant as a white male, in his 20s, approximately 5'11" tall, stocky, having blond, curly hair and blue eyes. The investigating officers also spoke with two individuals at the crime scene who stated that they were in the general vicinity of the Prairie Path and had observed a man leaving the area at about the time of Smith's rape. These two individuals (witnesses) described the person (suspect) as a white male, 30 to 35 years of age, 5'6" to 5'7", with a flabby build and blond, light, curly hair.

Shortly thereafter, Detective Stuckey arrived at the Prairie Path and spoke with the investigating officers. They relayed the victim's description of her assailant to the Detective, who then took charge of the case. Detective Stuckey transported Smith to a hospital, where she was administered a sexual assault kit.[4] The Detective had intended to question Smith immediately upon her release from the hospital, but because she had become ill, she returned home instead of proceeding with the interview. The following morning Smith met with Detective Stuckey at the Sheriff's Department, and she again detailed the attack, identifying her assailant as a white male, in his 20s, 5'11" tall, approximately 180 pounds, having blond, curly hair and blue eyes, wearing a navy blue tee-shirt, blue jeans spattered with paint, and blue and white gym shoes. A composite sketch of the assailant was prepared based on this description.

Some two months after the assault, on the evening of September 16, 1992, the plaintiff Tangwall, dressed in a navy blue tee-shirt, blue jeans, and blue and white gym shoes, entered the Geneva Inn Restaurant in Carol Stream, Illinois, where Smith was employed

1. Tangwall joined the victim in the sexual assault, Valerie Smith, as a defendant in the false imprisonment and malicious prosecution claims, but later filed a motion to vacate a default judgment against her and dismiss her as a party to the action, pursuant to FED.R.CIV.P. 41(a)(1). The court granted that motion on January 23, 1996.

2. Tangwall does not contest the court's grant of DuPage County's motion for summary judgment.

3. At oral argument, Detective Stuckey's counsel stated that we need not consider the "advice of counsel defense" in the event that we decide the "qualified immunity" issue in her client's favor. Because we hold today that Detective Stuckey is entitled to qualified immunity, we accordingly do not reach the "advice of counsel defense" question.

4. A sexual assault kit includes a series of procedures which isolates and preserves detectable physical evidence of an assailant for analysis at a later time. The kit was sent to the DuPage County Crime Lab, which later forwarded some samples to the Illinois State Police Laboratory.

as a waitress. Since Tangwall's attire resembled that of her attacker, Smith's attention was immediately drawn toward him. For a period of about half an hour, while waiting on other customers, Smith had an opportunity to intermittently observe Tangwall's face and physical appearance as he sat in a booth eating dinner.[5] She thought that he "looked a little bit older" than she remembered, but believed his weight was about the same.[6] In fact, at the time, Tangwall was 43 years of age, approximately 6' tall and 220 pounds, with straight, medium-brown hair and green eyes. After observing Tangwall, Smith became convinced that he was her assailant. She telephoned her mother, who, in turn, notified the police. When officers of the DuPage County Sheriff's Department (Detective Stuckey again not being among them) arrived at the restaurant, Smith directed them to Tangwall's booth. Notwithstanding the company of armed law enforcement officers, Smith was so fear-striken by Tangwall's presence that she refused to go anywhere near him.

The responding officers spoke with Tangwall and asked him to accompany them to the DuPage County Sheriff's Department, and he agreed to do so. Detective Stuckey was thereafter notified that an individual whom Smith had identified as her attacker was being conveyed to the Department. Stuckey spoke with Tangwall at the Department headquarters and, after informing the plaintiff-appellee of Smith's identification in the restaurant, the Detective read him his *Miranda* rights. Tangwall emphatically denied any involvement in, or knowledge of, the crime. At that time, Detective Stuckey proceeded to make a series of telephone calls. Initially, he contacted Smith at home to confirm her identification of Tangwall. Next, he called an Assistant State's Attorney for DuPage County, who approved charges against Tangwall for the felony of criminal sexual

assault. And finally, the Detective again called Smith in an attempt to make absolutely certain that Tangwall was the individual who attacked her on July 16, 1992. She again confirmed that Tangwall was her attacker.[7] Detective Stuckey arrested Tangwall based on the foregoing information. That same day, Tangwall was formally charged with criminal sexual assault and released on bond within twenty-four hours.

The investigation into Smith's assault continued. As part of the investigation, the Illinois State Police medically analyzed saliva and hair standards obtained from Tangwall and, in a report dated December 23, 1992, concluded that "the seminal material identified on [the victim's] shorts *could have originated from D. Tangwall.*" Some time later, however, Tangwall agreed to subject himself to a DNA test, the results of which were returned to Detective Stuckey on June 16, 1994. The DNA analysis excluded Tangwall as Smith's assailant. The next day, the Government requested, and the court entered, a *nolle prosequi* of Tangwall's criminal sexual assault charge based on these DNA test results. Three years after her identification of Tangwall, Smith remained convinced that he was her attacker, having stated at her deposition, "Well, the DNA—you know, that's just a DNA. But I'll believe it as long as I live that it's still him."[8]

On September 19, 1994, Tangwall brought suit under 42 U.S.C. § 1983, alleging that Stuckey, while acting as an agent or employee of DuPage County, arrested him for the felony of criminal sexual assault without probable cause, in violation of the Fourth and Fourteenth Amendments to the Constitution. He also asserted several state claims against the Detective and alleged *respondeat superior* liability against the County of DuPage on account of the official acts of its employee,

---

5. Smith stated in deposition testimony that she spent about five of these thirty minutes focusing on Tangwall's face.

6. Because Smith's statement that Tangwall appeared to be a little older than her attacker, but that his weight was about the same, was made at deposition, the officers at the Geneva Inn Restaurant were not aware of the age discrepancy.

7. At her deposition, Smith testified that she could not remember whether she had spoken with Detective Stuckey on those two occasions.

8. Neither before nor after Smith identified Tangwall in the restaurant has she encountered or seen pictures of another individual who she believed to be her attacker.

Detective Stuckey. On May 10, 1996, Stuckey, claiming qualified immunity, and the County of DuPage joined in filing a motion for summary judgment; the district court granted the County's motion and denied Stuckey's.[9] In denying Stuckey's motion and, in turn, his claim of qualified immunity, the court reasoned that the existence of probable cause remained the center of a factual dispute because of: (1) the discrepancies between Tangwall's appearance and the descriptions given by Smith and the witnesses; (2) Stuckey's failure to have Smith identify Tangwall in Stuckey's presence; and (3) Stuckey's credibility, or lack thereof, as illuminated by Smith's testimony that she did not recall speaking with him the night of Tangwall's arrest. It went on to conclude that these issues of material fact precluded a grant of summary judgment. Stuckey appeals that determination. We reverse.

## II. ISSUES

The parties present two issues for review. Initially, Tangwall asserts that this Court lacks jurisdiction to hear Detective Stuckey's appeal because the trial court's denial of summary judgment turned on a factual dispute relating to whether the Detective's actions were objectively reasonable in light of clearly established law. Detective Stuckey argues that, as a matter of law, Smith's firm and positive identification of Tangwall as her assailant to the Detective's fellow officers on September 16, 1992, was not in violation of clearly established law and, thus, the district court committed error in denying his claim of qualified immunity.

## III. DISCUSSION

As previously noted, this interlocutory appeal comes to us on denial of Detective Stuckey's motion for summary judgment on his qualified immunity claim, and "[w]e re-

view a district court's [denial] of summary judgment and its determination [whether] the defendant[ ][is] entitled to qualified immunity *de novo.*" *Jones v. Watson,* 106 F.3d 774, 777 (7th Cir.1997). A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Case law mandates that "[w]hen determining if a genuine issue of material fact exists, all facts must be construed in the light most favorable to the party opposing the motion and the court must draw all inferences in favor of that party." *NLFC, Inc. v. Devcom Mid–America, Inc.,* 45 F.3d 231, 234 (7th Cir.1995).

### A. Qualified Immunity

■ The necessity of protecting police officers from "undue interference with their duties and from potentially disabling threats of liability" has given rise to the doctrine of qualified immunity, *Harlow v. Fitzgerald,* 457 U.S. 800, 806, 102 S.Ct. 2727, 2732, 73 L.Ed.2d 396 (1982) (citations omitted), which protects *"public officials performing discretionary functions . . . against suits for damages unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known."* *Doe v. Bobbitt,* 881 F.2d 510, 511 (7th Cir.1989) (emphasis added) (citing *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738). Qualified immunity, as applied in the context of an alleged unlawful arrest, "will shield a police officer from § 1983 liability if 'a reasonable officer could have believed [the plaintiff's arrest] to be lawful, in light of clearly established law and the information the [arresting] officers possessed.' " *Eversole v.*

9. In granting DuPage County's motion for summary judgment, the district court relied on *Moy v. County of Cook,* 159 Ill.2d 519, 203 Ill.Dec. 776, 780, 640 N.E.2d 926, 930 (1994), wherein the Supreme Court of Illinois determined that, under Illinois law, an employer/employee relationship does not exist between a county and its sheriff, who is instead a county officer, and thus, a county is not liable for the actions of its sheriff

under the *respondeat superior* doctrine. *Id.* We note that while the Moy decision relieves a county of liability to a *plaintiff* in a § 1983 action, the county's duty to indemnify Sheriff's Department *defendants* for judgments rendered against them in § 1983 suits remains unaffected. *See* 55 ILL. COMP. STAT. ANN. 5/5–1002 (West 1993) (formerly 34 ILL. COMP. STAT. ANN. 5/5–1002).

*Steele,* 59 F.3d 710, 717 (7th Cir.1995) (quoting *Hunter v. Bryant,* 502 U.S. 224, 229, 112 S.Ct. 534, 536, 116 L.Ed.2d 589 (1991)). Accordingly, Detective Stuckey will enjoy immunity if *either* the federal law he is asserted to have breached was not clearly established at the time of the alleged violation or there exists no genuine dispute of material fact which would prevent a finding that his actions, with respect to following such clearly established law, were objectively reasonable. *See Vargas–Badillo v. Diaz–Torres,* 114 F.3d 3, 5 (1st Cir.1997). We must, however, for the moment postpone our inquiry into the substance of Stuckey's immunity claim so that we might deal with a most important preliminary matter; namely, whether we even have jurisdiction to entertain this appeal.

### 1. Jurisdiction

█ The jurisdiction of this Court is circumscribed by statute, 28 U.S.C. § 1291, to hearing appeals only from "final decisions" of the federal trial courts. A district court's denial of a claim of qualified immunity is one such appealable "final decision," notwithstanding the absence of a final judgment, to the extent that "the issue on appeal is limited to 'whether or not certain facts show[ ] a violation of clearly established' law." *Rambo v. Daley,* 68 F.3d 203, 205 (7th Cir.1995) (quoting *Johnson v. Jones,* 515 U.S. 304, 311, 115 S.Ct. 2151, 2155, 132 L.Ed.2d 238 (1995)). This is a purely legal question, and will often, but not always, be analytically separate from the merits of the underlying claim.

█ Against this legal backdrop stands the rule that where "a defendant's immunity depends on a resolution of conflicting factual assertions, or even on determining whether there is a contestable factual question material to the defense of immunity, ... [we] ha[ve] no jurisdiction...." *Anderson v. Romero,* 72 F.3d 518, 519 (7th Cir.1995). More specifically, we are obliged to dismiss a case for want of jurisdiction if an appellant urges that, contrary to the trial court's findings, an examination of the record reveals that there are no facts in dispute, or that the record contains evidence insufficient to create a dispute. *See Johnson,* 515 U.S. at 313–14, 115 S.Ct. at 2156–57; *see also, Collins v. Jordan,* 102 F.3d 406, 412 (9th Cir.1996) (citing *Johnson).* This appears to be the gist of Tangwall's jurisdictional argument. He references the district judge's July 15, 1996, "Memorandum Opinion and Order," quoted below, in an attempt to cast the question of whether Detective Stuckey's actions violated clearly established law as a factual issue:

[A] factual dispute exists as to whether defendant Stuckey had probable cause to arrest plaintiff because of the disparity in weight and age between plaintiff and the victim's original description of her assailant and Stuckey's failure to have the victim identify plaintiff in his presence in light of these discrepancies. There are also factors which call into question Stuckey's credibility including the assertion that he talked with the victim personally the evening of the arrest when she does not recall doing so.[10]

*Tangwall v. Stuckey,* 1996 WL 406656, at \*3 (N.D.Ill. July 17, 1996). It does not necessarily follow from the principles set forth in the introductory sentences to this paragraph that the mere existence of a factual dispute automatically precludes an immunity appeal. *Anderson,* 72 F.3d at 519. *Rather, we still have jurisdiction to consider the legal question of whether a disputed fact is*

---

**10.** Although Detective Stuckey's counsel included the district court's "Memorandum and Order" in her appendix submitted to this Court, the page from which this passage is excerpted was altered so as to omit the quoted language. We admonish her for her failure, whether intentional or inadvertent, to strictly comply with Circuit Rule 30(a), which requires the parties to "submit, bound with the main brief, and appendix containing the judgment or order under review and any opinion ... delivered by the trial court upon the rendering of that judgment," after certifying that she had so complied with the Rule. "[I]n an era of swollen appellate dockets, courts are entitled to insist upon meticulous compliance with rules sensibly designed to make appellate briefs as valuable an aid to the decisional process as they can be." *Avitia v. Metropolitan Club of Chicago, Inc.,* 49 F.3d 1219, 1224 (7th Cir.1995). Thus, when counsel certifies that she has complied with a rule of this Court, she would be well advised henceforth to do so, lest she wish to subject herself to possible sanctions. *See Hill v. Porter Mem'l Hosp.,* 90 F.3d 220, 226 (7th Cir. 1996).

material. See Behrens v. Pelletier, 516 U.S. 299, 312–14, 116 S.Ct. 834, 842, 133 L.Ed.2d 773 (1996); see also, Collins, 102 F.3d at 412 (citing Behrens). In other words, "[i]f there is no possible resolution of the disagreement that would save the plaintiff's case from the defense of immunity, the appellate court will not have to resolve any factual disagreements . . . in order to determine whether the defense is good." Anderson, 72 F.3d at 520–21.

We are of the opinion that the above-quoted factual disputes to which the judge alluded, and upon which Tangwall now relies, are immaterial for purposes of determining whether the Detective acted with objective reasonableness in adhering to clearly established law. Simply stated, the factual bases underlying probable cause and, resultingly, Detective Stuckey's claim of qualified immunity remain undisputed; namely, that Smith positively and unequivocally identified Tangwall as her attacker to the Detective's fellow officers in the restaurant on the night of his apprehension, that the identification was promptly relayed to Stuckey, and that he arrested Tangwall in good-faith reliance on this information. Again, we shall reserve addressing whether Detective Stuckey acted in violation of clearly established law and, alternatively, the merits of his qualified immunity defense until later in this opinion. In the interim, we proceed to discuss exactly why the three above facts pose no

relevance to the substance of our ensuing immunity analysis.

■ As previously noted, Tangwall urges that we lack jurisdiction because of the alleged apparent disparities between the weight and age of the individual who Smith described as her attacker on July 16, 1992, as contrasted with Tangwall's appearance on the evening of his arrest. What he fails to acknowledge, however, is that once a putative victim, like Smith, has positively identified her attacker to the police and they have no reason to disbelieve her, the officers "need not take any additional steps to corroborate the information regarding the crime before taking action." United States v. Decoteau, 932 F.2d 1205, 1207 (7th Cir.1991) (emphasis added). The identification itself establishes probable cause to make an arrest, even where other witnesses' descriptions of the alleged perpetrator differ from the physical appearance of the individual so identified. See, e.g., Gramenos v. Jewel Cos., Inc., 797 F.2d 432, 437 (7th Cir.) (holding that a trustworthy witness' identification of an alleged shoplifter established probable cause despite fact that police had knowledge of information which "might lead a jury to conclude that other shoppers had mistaken the [accused's] arrest for that of some other person" because "[e]yewitness descriptions are notoriously full of inaccuracies."), cert. denied, 481 U.S. 1028, 107 S.Ct. 1952, 95 L.Ed.2d 525 (1987).[11] As

11. We are of the opinion that the circumstances of this case provide an even more compelling justification than those in Gramenos to discount the discrepancies between Smith's description of her rapist and Tangwall's appearance. A sexual assault is without question a severe trauma on any individual, and even more so for a mere child of fifteen years of age. Sad as it is, the severe psychological and emotional shock induced by such an event does not dissipate in one hour, one day, or even possibly a lifetime, and descriptions solicited in the interim do not have the benefit of calm and considered reflection. As the Eighth Circuit explained in Graham v. Solem, 728 F.2d 1533 (8th Cir.1984):

[C]onsideration must be given for the victim's real life situation when she is forcibly raped. . . . The approach to the test of reliability must have a measure of flexibility; otherwise, the victim is in an impossible situation. If common sense and practical experience are drawn upon, the victim's identification does not seem improbable or unreliable for the pur-

poses of our constitutional analysis. Indeed, it is a common experience that after encountering strangers, an individual may not be able meaningfully to describe them to others. Yet, the faces may be etched in his or her memory, and upon seeing them again there is an immediate recognition.

Id. at 1548 (emphasis added) (explaining why a victim's failure to give a prior description of her attacker is excusable and should not render a subsequent identification constitutionally infirm). In deposition testimony taken more than three years after the attack, Smith explained that her assailant weighed 130 pounds and was in his late thirties. This, considered with her statement that Tangwall's weight on the evening she identified him at the Geneva Inn Restaurant (220 pounds) was the same as her assailant's, could very well reflect Smith's youthful inexperience in estimating older persons' weight. Such errors are not unusual in layperson descriptions and, as pointed out above, in those of individuals who have suffered through the severely traumatic ex-

such, the alleged discrepancies between Smith's original description of her attacker and Tangwall's appearance on the evening of his arrest do not affect our inquiry into whether Detective Stuckey's actions were objectively reasonable in light of clearly established law.

Equally unavailing is Tangwall's assertion that jurisdiction is precluded herein due to the "disputed" fact that Smith failed to identify him as her attacker in Detective Stuckey's presence. Such a proposition not only defies logic, but also this Circuit's long-standing recognition of the "collective knowledge doctrine." Indeed, it is a well-established principle of our jurisprudence that:

> [T]he police who actually make the arrest need not personally know all the facts that constitute probable cause if they reasonably are acting at the direction of another officer or police agency. *In that case, the arrest is proper so long as the knowledge of the officer directing the arrest, or the collective knowledge of the agency he works for, is sufficient to constitute probable cause.*

*United States v. Valencia*, 913 F.2d 378, 383 (7th Cir.1990) (emphasis added) (citing *United States v. Rodriguez*, 831 F.2d 162, 165–66 (7th Cir.1987); *United States v. Scott*, 678 F.2d 606, 611 (5th Cir.1982); 2 Wayne R. LaFave, *Search & Seizure* § 3.5(b) (2d ed.1987)). As the Supreme Court explained in *United States v. Hensley*, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985), " '[e]ffective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and that officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information.' " *Id.* at 231, 105 S.Ct. at 682 (quoting *United States v. Robinson*, 536 F.2d 1298, 1299 (9th Cir. 1976)). Therefore, so long as "the facts and circumstances within [an agency's collective] knowledge ... warrant a prudent person in believing that the [suspect] had committed or was committing an offense," *Beck v. Ohio*, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142, 91 (1964), an officer of that agency, acting in good-faith reliance on such "facts and circumstances," has probable cause to effectuate an arrest. *See Hensley*, 469 U.S. at 232, 105 S.Ct. at 682 (1985). That having been said, simply because Detective Stuckey was not present at the Geneva Inn Restaurant on the evening that Smith identified Tangwall to officers of the DuPage County Sheriff's Department—the same agency for which Stuckey worked—it does not follow that he could not have acted in comport with clearly established law.

The final factual dispute Tangwall raises—whether the Detective actually spoke with Smith to confirm her earlier identification of Tangwall in the restaurant—likewise proves irrelevant to assessing the reasonableness of Stuckey's conduct.[12] In essence, Tangwall

---

perience of a sexual assault. *See People v. Holmes*, 141 Ill.2d 204, 152 Ill.Dec. 268, 272, 284–85, 565 N.E.2d 950, 954, 966–67 (1990) (noting "that very few persons are keen or trained observers" and that discrepancies are not uncommon); *People v. Palmer*, 125 Ill.App.3d 703, 81 Ill.Dec. 54, 60, 466 N.E.2d 640, 646 (1984) (adding age to the observation " 'that few people are accurate judges of height and weight, and that many people are notoriously poor judges' " (quoting *People v. Evans*, 25 Ill.2d 194, 184 N.E.2d 836, 839–40 (1962)) (emphasis added).

12. We are reluctant to definitively construe this last fact as "disputed." In his "Response to Stuckey's Motion for Summary Judgment," Tangwall contended that *"Detective Stuckey's contact with Ms. Smith on the night he arrested Donald Tangwall consisted solely of telephone calls to her at her residence."* (R. 25, Pl.'s Resp. Mot. Summ. J. at 3 (emphasis added)). In our view, this is effectively the plaintiff-appellee's concession that the Detective had, in fact, telephonically confirmed Smith's identification on September 16, 1992. We thus fail to understand how Tangwall can now characterize the nature of those calls as anything but "undisputed." It is also noteworthy that Smith's inability to recall speaking with Stuckey about the identification is consistent with her general lack of recollection with respect to the Detective's involvement in the case. For example, it is uncontroverted that Detective Stuckey transported Smith to the hospital on the evening she was assaulted, and interviewed her the following day. However, although Smith knew of and could identify Stuckey at the time of her deposition, she could not remember whether the Detective or "someone else" had taken her to the hospital on July 16, 1992, and subsequently met with her on July 17 to discuss the attack. As previously noted, Smith was so fear-stricken by Tangwall's presence in the Geneva Inn Restaurant on the evening she identified him to law enforcement officers that

contends that Stuckey's credibility is called into question because Smith has no recollection of ever having spoken with the Detective on September 16, 1992, and therefore, there are "serious credibility issues surrounding Stuckey's testimony" relating to whether he reasonably acted pursuant to clearly established law. (Appellant's Br., at 3). In our view, Tangwall's argument is misdirected. That is, *Detective Stuckey's* credibility regarding his alleged conversations with Smith does not address whether *Smith's* September 16 identification was sufficiently truthful and reliable so as to warrant Tangwall's arrest. Because Smith's *undisputed* identification is determinative of the reasonableness of Stuckey's decision to arrest Tangwall, subsequent disputed events, like the Detective's communications with Smith, or the lack thereof, are immaterial. Credibility attacks derived from such events are similarly inconsequential.

We thus conclude that the three alleged "disputed" facts upon which Tangwall relies do not affect our inquiry into whether Detective Stuckey conducted himself in accordance with clearly established law. As previously mentioned, it is within the purview of this Court's jurisdiction to consider the legal question of whether a factual dispute is material, as well as whether or not certain facts demonstrate a violation of clearly established law. To the extent that this case does not require us to venture outside of those inquiries, we are unpersuaded by any suggestion that our jurisdiction-diction over this appeal is somehow precluded.

### 2. Clearly Established Law and the Objective Reasonableness of Detective Stuckey's Actions

■ With the jurisdictional matters behind us, we turn to address the merits of Detective Stuckey's qualified immunity defense, and the district court's rejection thereof on summary judgment. To reiterate, qualified immunity will shield a law enforcement officer (i.e., Detective Stuckey) from § 1983 liability if *"a reasonable officer could*

*have believed [the arrest] to be lawful, in light of clearly established law and the information the [arresting] officers possessed."* *Hunter,* 502 U.S. at 227, 112 S.Ct. at 536 (emphasis added) (quoting *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987)). Neither party herein disputes that the constitutional right to be free from arrest without probable cause was well-established at the time of Tangwall's arrest in 1992. *See, e.g., Beck,* 379 U.S. at 91, 85 S.Ct. at 225. And, for the following reasons, we are of the opinion that no reasonable officer would have been led to believe that the arrest was somehow unlawful.

■ The gravamen of Tangwall's argument is that Detective Stuckey violated his Fourth Amendment right to be free from unreasonable seizure by arresting him without a warrant or probable cause. Of course, one need not first obtain a warrant to effectuate a constitutionally valid arrest. Rather, "[a] warrantless arrest is lawful under the Fourth Amendment if supported by probable cause." *Jones,* 106 F.3d at 778. Accordingly, Detective Stuckey is "entitled to immunity if a reasonable officer could have believed that probable cause existed to support the arrest." *Id.* We hold today that the victim Smith's *undisputed* clear and positive identification of Tangwall on September 16, 1992, to officers of the DuPage County Sheriff's Department, which was promptly related to Detective Stuckey, himself a DuPage County authority, would have led a reasonable police officer to believe that he was obeying the Fourth Amendment's probable cause requirement in proceeding to arrest the plaintiff-appellee, thereby entitling Stuckey to immunity.

■ We begin with a recognition that probable cause is a relatively fluid concept. It exists "if 'at the moment the arrest was made . . . the facts and circumstances within [the arresting officer's] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent man in believing that'" the arrestee was

---

she refused to go near the booth in which he was sitting. This could very well explain why Smith's mind was elsewhere later that night and, consequently, why she could not recall speaking with Detective Stuckey.

committing, or had committed, a crime. *Hunter*, 502 U.S. at 228, 112 S.Ct. at 537 (quoting *Beck*, 379 U.S. at 91, 85 S.Ct. at 225). As an objective test, probable cause is "less than a rule of more-likely-than-not, but how much less depends on the circumstances," *Gramenos*, 797 F.2d at 438, including "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949).

We believe that Smith's identification of Tangwall in the restaurant to Detective Stuckey's fellow officers would have warranted a reasonable officer to conclude that the plaintiff was her attacker. Just as this Court first held in *Gramenos*, and in numerous subsequent cases, *see, e.g., Decoteau*, 932 F.2d 1205; *Gerald M. v. Conneely*, 858 F.2d 378 (7th Cir.1988), *"When an officer has 'received his information from some person— normally the putative victim or an eye witness—who it seems reasonable to believe is telling the truth,' he has probable cause." Gramenos*, 797 F.2d at 439 (emphasis added). No deep-seated logic and/or rationale underlies this principle. After all, probable cause is a commonsense determination, measured under a reasonableness standard. When a confirmed rape victim summons the police to her place of work, directs their attention to a man across the room and, being so fearful that she refuses to go anywhere near the individual, exclaims, "That's my attacker!," the prudent person hypothesized in *Hunter* would naturally be led to believe that the man so identified had, in fact, committed the crime. Indeed, the present situation is quite similar to the one we addressed in *Gramenos*, a case wherein a supermarket security guard witnessed the defendant, Gramenos, hiding items away in his pockets and attempting to leave the store without paying for them. The guard detained Gramenos and summoned the police, who, in the face of Gramenos's protestations of innocence, arrested him based on the guard's information. After Gramenos was acquitted on charges of "shoplifting," he brought suit against various parties, including his arresting officers, under § 1983. On appeal from the trial court's grant of the defendants' motion for summary judgment, we concluded that the guard's identification of Gramenos as a shoplifter was sufficient to provide probable cause to lawfully arrest him:

> Police have reasonable grounds to believe a guard at a supermarket. We need not say that police always are entitled to act on the complaint of an eyewitness; a guard is not just any eyewitness. The chance that the complainant is pursuing a grudge, a risk in believing an unknown witness, is small in an institutional setting. The guard who pursues a private agenda may be fired and disgraced.... The store will insist that guards err on the side of caution. It does not want to embarrass and anger an honest customer....

*Id.* at 439.

At oral argument, Tangwall insinuated that the rule in *Gramenos* is somehow limited to identifications provided by security guards and other eyewitnesses who are subject to "institutional safeguards." We disagree. The question is whether *"it seems reasonable* [for] the police to believe that [the putative victim or] eyewitness was telling the truth," *Decoteau*, 932 F.2d at 1207 (emphasis added), and it is the plaintiff's initial burden in a § 1983 case to prove the unreasonableness of an officer's belief, as opposed to the defendant's onus to demonstrate the reasonableness thereof. *See Eversole*, 59 F.3d at 717 (explaining that "it is the plaintiff who bears the burden of proof" under the two-part qualified immunity test); *Conneely*, 858 F.2d at 380 ("The [plaintiffs] offer absolutely nothing that suggests to us that it was unreasonable to believe [the victim's] statements."). Our *Gramenos* opinion simply expanded upon this principle, and hinted that a plaintiff might perhaps have greater difficulty in overcoming his burden when the "risk in believing an unknown witness[ ] is small," like in the context of "an institutional setting." *Gramenos*, 797 F.2d at 441. The reality of the matter is that we have, in fact, applied *Gramenos's* holding to situations where a *victim*, like Smith, has identified her aggressor to police, thus forming the basis to carry out a lawful arrest. *See Grimm v. Churchill*, 932 F.2d 674, 675 (7th Cir.1991) (finding probable cause when an officer re-

ceived information from the victim); *Conneely,* 858 F.2d at 381 (concluding probable cause existed to detain on basis of ten-year-old child victim's complaint).

Tangwall has failed to provide us with a compelling argument as to why we should depart from our well-reasoned analysis in the above line of authorities. He cites to *Hebron v. Touhy,* 18 F.3d 421, 422–23 (7th Cir.1994), as bringing the present case outside the rule in *Gramenos,* but to no avail. In *Hebron,* this Court observed that:

> Sometimes information from or about a person claiming to be the victim of crime would lead a reasonable officer to be suspicious, making further investigation prudent—and, because the reasonableness standard of the fourth amendment links the constitutional obligation to the standard of prudent conduct, the officer must do more. [The arresting officers] knew that [the victims] were being evicted, and the significant chance that they bore a grudge against [the accused] would have made it unreasonable—and therefore unconstitutional—to arrest the [accused] on the [victims'] mere say-so.

*Id.* at 423. While Tangwall quotes this language in his brief, he fails to explain how it applies to this case, and for good reason, for there is no evidence in the record, either direct or indirect, suggesting that Smith was somehow predisposed to falsely accusing him as her attacker. As a result, he is left to argue that Smith must have intentionally misidentified him because DNA tests, conducted almost two years after his arrest, proved that he in fact was not her assailant.[13] This, of course, is a ludicrous proposition—if we were to accept it, the doctrine of "qualified immunity" would effectively fall by the wayside, for every "false arrest" case, by definition, involves a situation wherein the police have apprehended the wrong person. Indeed, "[p]robable cause does not depend on the witness turning out to have been right;

it's what the police know, not whether they know the truth, that matters." *Id.* at 439.

In short, when Smith identified Tangwall in the Geneva Inn Restaurant to Detective Stuckey's fellow officers, there was no reason to doubt her sincerity. Because the law is clear that a believable victim's single identification can provide the basis for probable cause, a reasonable officer would thus have believed that Tangwall's arrest was constitutionally valid at that point in time. Detective Stuckey's fellow officers could have lawfully apprehended the plaintiff before transporting him to the DuPage County Sheriff's Department, but they chose not to do so. Instead, they turned Tangwall over to Stuckey, who, being in charge of the case, made the arrest himself. This was well within the Detective's authority. As discussed above, an officer can lawfully act solely on the basis of fellow officers' statements if the officers issuing the statements possessed the facts and circumstances necessary to support a finding of probable cause. *See Hensley,* 469 U.S. at 232, 105 S.Ct. at 682. Once Smith pointed out Tangwall to officers of the DuPage County Sheriff's Department on September 16, 1992, and this information was relayed to Stuckey, he was entitled to arrest the plaintiff-appellee.

## IV.  CONCLUSION

This is not the first case of a mistaken arrest, nor will it certainly be the last. Law enforcement is a tough assignment, one wherein police officers will inevitably make errors. It is the unfortunate circumstance when they do arise, but such is the price we must pay to live in a society whose citizens are not always as civilized as one might hope. Perhaps our counterparts in the Fourth Circuit put it best when they explained:

> We do not minimize the misfortune that occurred here—misfortune that undoubtedly occasioned disruption and distress in

---

**13.** During his deposition, Tangwall was repeatedly asked what information existed to support his allegation that Smith "intentionally misidentified [him] knowing that [he wasn't] the person [who attacked her]." Tangwall's responses ranged from the sarcastic, "Well, that's obvious," to "[I]t was absolutely not me anyway," to

"I do not know." In short, he never answered the question, and "[w]e are left to dream up reasons why [Detective Stuckey's] decision regarding probable cause was in error, and this is an exercise suited for advocates, not judges." *Conneely,* 858 F.2d at 381.

the lives of these plaintiffs. We regret that the Torchinskys were arrested for a crime they did not commit, but not every unfortunate incident gives rise to § 1983 liability against a municipality or its officials. The police must be held to standards of reasonableness, not to standards of perfection. A society that expects police officers to provide protection must afford them in turn some protection from lawsuits. If immunity is lost in every case of mistaken arrest, then many a perpetrator of violent crime will go unapprehended.

*Torchinsky v. Siwinski,* 942 F.2d 257, 264 (4th Cir.1991).

We hold that Stuckey did not violate a clearly established law and that he is entitled to qualified immunity and dismissal of the lawsuit against him. The judgment of the district court is

REVERSED.